# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MATTHEW RINAUDO and MIZKIF** | § | |
| **ENTERPRISES, LLC,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No. 1:25-CV-01773-RP** |
| | § | |
| **EMILY BETH SCHUNK, ZACK** | § | |
| **HOYT, OTK MEDIA INC. d/b/a** | § | |
| **ONE TRUE KING, MYTHIC** | § | |
| **TALENT MANAGEMENT INC. and** | § | |
| **KING GAMING LABS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

**<u>AFFIDAVIT OF MOHAMMAD ARABIKATBI IN SUPPORT OF DEFENDANTS'</u>**
**<u>MOTION TO COMPEL ARBITRATION AND STAY LITIGATION</u>**

STATE OF TEXAS )
) ss
COUNTY OF WILLIAMSON )

Mohammad Arabikatbi, pursuant to 28 U.S.C. §1746, states the following under the penalty of perjury:

1. I am over 18 years of age, of sound mind and otherwise competent to make this Affidavit.

2. The statements set forth in this Affidavit are based upon my personal knowledge. I have been the Chief Executive Officer of Defendant, OTK Media, Inc. ("OTK") since December 16, 2022. OTK is the parent company of Defendants, Mythic Talent Management Inc. ("Mythic") and King Gaming Labs, Inc. ("King"). I have been the President of both Mythic and King since their formations in 2022.

3.     As such, I am familiar with the operations of OTK, Mythic, and King, and with the matters described in this Affidavit.

4.     I submit this Affidavit in support of the motion by OTK, Mythic, and King (collectively, "Moving Defendants") to compel arbitration of Plaintiffs, Matthew Rinaudo (aka Matthew Misrendino) ("Rinaudo") and Mizkif Enterprises LLCs' (collectively, "Plaintiffs") claims against Mythic and to stay the above-captioned action pending a decision on the motion and, in turn, final resolution of the arbitrable claims.

5.     This Affidavit is submitted to provide background and context regarding the actions taken by the Moving Defendants and in support of their request to compel arbitration and stay the litigation.  In particular, this Affidavit will demonstrate that the claims against Mythic are inextricably related to those against OTK and King and that a final arbitration award relating to the Mythic claims could prove to be dispositive of Plaintiffs' remaining claims against OTK and King.  To do so, it is important to understand the facts and the history of the parties as set forth herein.

6.     This Affidavit is not intended to ask the Court to resolve disputed facts.  Moving Defendants reserve all rights.

7.     OTK is in the business of content creation and media.  OTK was formed by a group of content creators in 2020 in Austin, Texas for the purpose of creating a creating a media organization consisting of and owned by various popular online personalities.  By 2023, OTK's creators amassed over 2 billion total views and 50 million followers across streaming and social media platforms such as YouTube, Twitch, Instagram, X, and TikTok.

8.      Mythic is in the business of talent representation and management in the gaming, esports, streaming, and content creation industries.  Mythic represented Plaintiffs from approximately January 2023 to November 2025.

9.      King is in the business of developing and marketing personal computer gaming systems. King sells computer systems under the trade name Starforge Systems.

10.      As further described below, the allegations in Plaintiffs' Complaint arise from a series of related transactions and business dealings involving Plaintiffs and the Moving Defendants dating back to 2020.

11.       From September 20, 2020 through November 12, 2020, Plaintiff, Matthew Rinaudo (also known as Matthew Misrendino) entered into stock purchase agreements, a technology assignment agreement, and a proprietary information agreement with OTK.

12.      At the time, Rinaudo was considered a shareholder, co-owner, and founding member of OTK.  He was also appointed to the OTK Board of Directors.  As such, he was subject to OTK's rules and policies and all duties owed to a corporation by its owners, directors, and shareholders under Delaware law.

13.      In executing his initial set of agreements with OTK, Rinaudo acknowledged and agreed that his position in OTK would require him to establish and maintain goodwill with OTK's business partners and employees, and that such goodwill was extremely important to OTK's success.  As a media organization owned and operated by online personalities, it is self-evident that goodwill is essential to the business of OTK and its owners.

14.      On or about September 8, 2022, Rinaudo entered into a stock grant agreement with King, pursuant to which Rinaudo received shares of King in exchange for providing services to King.

15.    On September 20, 2022, OTK placed Rinaudo on a leave of absence to conduct a review and evaluate appropriate next steps concerning his status with the company in response to well-publicized allegations made against Rinaudo in preceding days, including allegations of racist/homophobic language[1] and additional allegations that later formed the basis for a lawsuit against Rinaudo, OTK, and others in the District Court for Travis County, Texas, Case No. D-1-GN-23-001507.

16.    Following his placement on leave, Rinaudo posted a statement on X on September 20, 2022 admitting much of the conduct he was alleged to have engaged in.    He called his conduct "inexcusable," his choices "poor," and words "reprehensible," and apologized to OTK, while vowing to take a break from streaming during his leave of absence.[2]

17.    OTK engaged outside legal counsel and conducted its own internal review concerning the September 2022 allegations against Rinaudo.

18.    Following that process, and based on the information available to it at the time, OTK offered Rinaudo a return from his leave of absence pursuant to the terms of an Owners Agreement, effective October 20, 2022 (the "Owners Agreement").    The Owners Agreement, and actions taken by OTK and King thereunder, are the subject of Plaintiffs' claims against OTK and King in this action.

19.    In connection with Rinaudo's return from leave, OTK also imposed certain conditions, including an indefinite suspension of Rinaudo from the OTK Board of Directors and an indefinite period of "monitored probation" to ensure that Rinaudo's publicly distributed content aligned with "OTK's core values."

---

[1] https://x.com/REALIcePoseidon/status/1572089527904108544?lang=en
[2] https://x.com/REALMizkif/status/1572391379396923392

20.     Rinaudo was also privately instructed that he must refrain from any similar instances of public scandal or negative publicity or that his standing within OTK would be further jeopardized. This concept, along with several others designed to protect the business interest of Moving Defendants, were codified in the Owners Agreement to provide for recourse in the event that Plaintiffs engaged in additional instances of misconduct that might tend to injure the success of Moving Defendants' businesses.

21.     A true and accurate copy of OTK's December 23, 2022 letter to Rinaudo relating to his return from his leave of absence, with confidential information redacted, is attached hereto as **Exhibit 1**.

22.     A true and accurate copy of the Owners Agreement, with confidential information redacted, is attached hereto as **Exhibit 2**.

23.     In relevant part, the Owners Agreement provides that it is "entered into by and between OTK Media, Inc. and the Company Affiliates (defined below) (collectively, the "Company) and [Rinaudo], an individual (the "Owner")." The term "Company Affiliates" is defined therein as OTK and "its affiliated venture entities (including, without limitation, [King], and similar affiliates that may come into existence hereafter).

24.     Mythic was formed as a wholly owned subsidiary of OTK on December 23, 2022 and thus falls within the definition of "Company Affiliates." By virtue of Rinaudo's relationship with OTK, he was aware of the corporate relationship between OTK and Mythic, and that Mythic would be considered a Company Affiliate under the Owners Agreement.

25.     As such, OTK, King, and Mythic are each a party to the Owners Agreement with Rinaudo.

26.     In the wake of, and to address the public controversy and conduct attributed to Rinaudo in September 2022, the Owners Agreement conferred OTK with certain rights, including the right to

terminate Rinaudo's relationship and/or cancel or repurchase his equity interests in OTK or its Company Affiliates in circumstances involving, among other things, alleged morals breaches, disparagement of OTK or its affiliates, conduct that could tend to injure OTK, King, Mythic or any other Company Party (as defined therein), or violated the Company's social media policy.

27.     On or about January 2, 2023, Rinaudo entered into the Representation Agreement with Mythic (the "Representation Agreement"), pursuant to which Mythic agreed to serve as Rinaudo's exclusive agent to "manage, develop, negotiate, organize, and administer all income producing opportunities and activities available to [Rinaudo] within and related to the digital media, gaming, content creation and entertainment industries."

28.     A true and accurate copy of the Representation Agreement, with confidential information redacted, is attached hereto as **Exhibit 3**.

29.     On or about April 17, 2023, Rinaudo was in a physical altercation during an owners' meeting of OTK (a meeting of its talent equity holders), which required the intervention by myself, and multiple others present, to stop Rinaudo from further attacking another owner of OTK.

30.     On or about September 26, 2023, Rinaudo was involved in a second violent incident with another content creator, portions of which were recorded on video and later publicly released. Based on information available to OTK at the time, the incident resulted in serious injuries to the other individual, including reported head and dental injuries.

31.     In response to these incidents, and based on its understanding of Rinaudo's conduct and its potential impact on the organization, OTK once again engaged outside counsel and conducted an internal review of Rinaudo's violent conduct.

32.     Following completion of its investigation, OTK issued Rinaudo its first Notice of Termination and Repurchase, dated November 6, 2023 (the "First Notice").

33.     A true and accurate copy of the First Notice, with confidential information redacted, is attached hereto as **Exhibit 4**.

34.     In the First Notice, OTK referenced the terms of Rinaudo's return from his 2022 leave of absence, including his probationary period described therein as well as OTK's contractual remedies under the Owners Agreement in the event of breach.  OTK terminated the Owners Agreement as to OTK only (notwithstanding its surviving provisions) and expressly reserved its rights to take future action(s) with respect to King or other Company Affiliates, including Mythic.

35.     In connection with its exercise of rights under the Owners Agreement, OTK provided Rinaudo with a promissory note in exchange for his shares of OTK (the "Promissory Note").

36.     A true and accurate copy of the Promissory Note, with confidential information redacted, is attached hereto as **Exhibit 5**.

37.     Among other things, the Owners Agreement and Promissory Note each provided that OTK could cancel remaining payment obligations and seek reimbursement of amounts paid to Rinaudo under the Promissory Note in the event that OTK determined that Rinaudo committed subsequent breaches of the Owners Agreement.

38.     Plaintiffs accepted the First Notice, Owners Agreement, and the Promissory Note and later executed an amendment to the Promissory Note related only to its payment schedule.  OTK complied with all of its obligations under the Promissory Note relative to payment and otherwise, and Plaintiffs accepted sums paid under the Promissory Note in the amount of $296,401.92.

39.     By early July 2025, OTK feared its relationship with Rinaudo had reached a final breaking point, including as a result of public statements made by Rinaudo about OTK that were disparaging or offensive toward the company.  Examples of such statements are cited in OTK's October 24, 2025 Second Notice of Termination and Repurchase – Demand for Repayment ("Second Notice"),

which is attached to Plaintiffs' Complaint as Exhibit A and is alleged by Plaintiffs to form the basis of their claims against Moving Defendants.

40.     On or about, October 19, 2025, OTK learned that Rinaudo made threatening remarks directed at Schunk in an effort to silence her from going public with her allegations that are referenced in Plaintiffs' Complaint.

41.     Drawing on its history with Plaintiffs in similar matters, OTK took action as soon as possible to further terminate its relationship(s) with Plaintiffs via the Second Notice, a process that OTK had already initiated due to Plaintiffs' breach of the Representation Agreement and the other reasons set forth in the Second Notice, and was accelerated upon OTK's learning of Rinaudo's threats directed at Schunk, an OTK owner.

42.     Within the Second Notice, OTK notified Plaintiffs that it had learned the full scope of Plaintiffs' breach of the Mythic Representation Agreement.  OTK stated that Plaintiffs engaged at least one (1) third-party agency to represent them in the negotiation and procurement of agreements in violation of the Representation Agreement with Mythic.  Such agreements were for the endorsement of products such as Rumble, Stake, Borderlands 4, Solo Leveling, and potentially others (the "Extracontractual Agreements").  In doing so, OTK estimated that Plaintiffs earned at least $4 million in gross compensation relating to the Extracontractual Agreements, which entitle Mythic to more than $600,000 in overdue Management Fees under the Representation Agreement.

43.     OTK issued the Second Notice following the above-referenced series of misconduct by Rinaudo's extending over a period of three (3) years, after various prior remedial efforts to address those issues had proven insufficient.

44.     In the Second Notice, OTK cited multiple breaches of the Owners Agreement, as determined by OTK, including morals clause violations, breaches of non-disparagement

obligations, and breaches of the Mythic Representation Agreement, as the bases for the actions taken by OTK.

45.     Specifically, OTK terminated Rinaudo's relationship with OTK and King, exercised its rights under the Owners Agreement to cancel the Promissory Note and seek reimbursement of amounts paid thereunder, repurchased Rinaudo's equity interests in King, and demanded payment of unpaid Management Fees on behalf of Mythic.

46.     Plaintiffs have sought a judgment declaring that Rinaudo did not breach the Mythic Representation Agreement.  OTK, however, has cited Rinaudo's breach of the Representation Agreement as one of the many bases for the actions in the Second Notice, which Plaintiffs allege are the basis for their claims against OTK and King.

47.     As a result, an evaluation of Plaintiffs' claims against OTK and King requires an inquiry into substantially the same conduct (namely, Rinaudo's alleged breach of the Representation Agreement) involving many of the same facts, witnesses, individuals, and entities that would be addressed in an arbitration proceeding concerning Plaintiffs' arbitrable claims against Mythic.

48.     As such, the resolution of Plaintiffs' claims against OTK, King, and Mythic, as well as any associated counterclaims or crossclaims, would necessarily require review of overlapping evidence and issues even though those claims would otherwise proceed in different forums absent a stay of all claims against Mythic, OTK, and King.

49.     Furthermore, the interpretation of the Representation Agreement in arbitration, and any determination concerning Rinaudo's alleged breach thereof, will have a direct bearing on the claims against OTK, King, and Mythic in this action.

50.     Whether Rinaudo breached the Mythic Representation Agreement is therefore a potentially dispositive issue with respect to this action, particularly because OTK cited Rinaudo's breach of

the Representation Agreement as one of several grounds for the actions taken pursuant to the Second Notice, which Plaintiffs allege form the basis of their claims.

51.     I respectfully request that the Court accept this Affidavit in support of Moving Defendants' Motion to Compel Arbitration and Stay Litigation.

52.     I declare under penalty of perjury that the foregoing is true and correct.


Dated: December 23, 2025                           /s/  Mohammad Arabikatbi
                                                        Mohammad Arabikatbi

# EXHIBIT 1

DocuSign Envelope ID: D1B17767-F7E9-4885-86AC-06A8BF1C34C5



December 23, 2022

***Via Email Only***
Mr. Matthew Misrendino

█████████████████

   ***Re: Return from Leave of Absence***

Dear Matt,

  As you are aware, you were previously placed on a leave of absence from OTK Media, Inc. and its affiliates (collectively, "OTK"), as of September 20, 2022 and continuing through present. In accordance with the letter dated October 13, 2022 confirming your leave of absence (the "Leave of Absence Letter"), OTK has conducted and completed an internal investigation of your publicized alleged conduct. OTK has now reviewed the findings and report of investigations counsel, and the purpose of this letter is to invite you back to OTK from your leave of absence, but OTK has determined that you shall only be eligible to return under the following conditions:

  i.  You shall agree to and execute this letter agreement and any attachments hereto, including the Owners Agreement (attached as Exhibit A) and Third Amendment to the Stock Purchase Agreement (attached as Exhibit B).

  ii.  As discipline for your conduct, you shall be suspended and/or removed from OTK's Board of Directors ("Board"), as determined by OTK, effective immediately and lasting for such time period as determined by the Board.

  iii.  You agree to a period of "monitored probation", which shall continue for a period to be determined in OTK's sole discretion, during which time OTK will be paying close attention to your content and conduct to ensure that you uphold OTK's core values.

  Further, as referenced in your Leave of Absence letter, the vesting of your shares under the Stock Purchase Agreement with OTK dated September 28, 2020 (as amended) (the "Stock Purchase Agreement") was paused as of September 20, 2022. Vesting shall restart when you again provide "Services" to OTK, which is currently anticipated to begin on or about January 1, 2023. In light of such pause, it is agreed that the vesting period as outlined in the Stock Purchase Agreement shall extend for an additional three (3) months from the date of restart, and as otherwise outlined in the Third Amendment to the Stock Purchase Agreement, attached as Exhibit B.

  By signing this letter, you acknowledge and agree to the conditions outlined herein. You agree that you will not disclose to third parties the existence or terms of this letter. This letter supersedes all prior negotiations, understandings or agreements (oral or written), between the parties concerning the subject matter hereof.

We continue to appreciate your understanding during this difficult time and trust that you will find the conditions for your return to OTK fair and reasonable in light of the circumstances. I would be happy to answer any questions that you may have.

Sincerely,

CEO

ACKNOWLEDGED AND AGREED:

DocuSigned by:

Matthew Misrendino

FBDB292ADEC6435

Matthew Misrendino

DocuSign Envelope ID: D1B17767-F7E9-4885-86AC-06A8BF1C34C5

## **EXHIBIT A**

Owner's Agreement

(see attached)

DocuSign Envelope ID: D1B17767-F7E9-4885-86AC-06A8BF1C34C5

**<u>EXHIBIT B</u>**

Third Amendment to Stock Purchase Agreement

(see attached)

# EXHIBIT 2

# OWNERS AGREEMENT

This Owners Agreement ("**Agreement**"), dated as of October 20, 2022 (the "**Effective Date**"), are entered into by and between OTK Media, Inc. and the **Company Affiliates** (defined below) (collectively, the "**Company**") and Matthew Misrendino, an individual (the "**Owner**"). For the purposes of this Agreement, each of Company and Owner may be individually referred to herein as a "**Party**" and collectively as the "**Parties**".

1. Owner Rights and Responsibilities.

   a. Owner shall render all services as reasonably requested by the Company and its affiliated venture entities (including, without limitation, King Gaming Labs, Inc., and similar affiliates that may come into existence hereafter, collectively, the "**Company Affiliates**") from time to time to the Company and the Company Affiliates as applicable (the "**Owner Services**") in a first-class, professional manner and shall be subject to the instructions and direction of Company and/or the Company Affiliates and their respective Boards of Directors, officers, and designated representatives. Without limiting the foregoing, Owner shall clearly identify the relationship with Company and applicable Company Affiliates on each and every one of the **Owner's social media channels, including, as applicable, Twitch, YouTube, Instagram, TikTok, Snap, Facebook, etc.**, in such a manner as reasonably directed by Company and Company Affiliates in consultation with Owner.

   b. Owner shall render all Owner Services in compliance with Company's Social Media Policy attached hereto as Schedule I and incorporated by reference herein, which may be updated from time to time by the Company's Board of Directors (the "**Social Media Policy**").

   c. Owner shall not engage in any activities that interfere, compete, delay or reduce the value of the rendering of the Owner Services hereunder. Company's determination in all manners respecting the performance of the Owners Services will be final and controlling, and Owner agrees to abide by all such determinations.

   d. Owner will perform the Owner Services at location(s) to be determined in Company's sole discretion. Company will book and pay for the reasonable costs in connection with any travel related to the Owner Services (including, without limitation, flight and hotel expenses).

   e. Owner shall actively participate in pursuing Company and/or Company Affiliate business initiatives, including, without limitation, finding new business opportunities, and shall bring all such new opportunities promptly to Company's attention.

   f. Unless Owner receives prior written consent to do so from Company, Owner will not accept any money, services or other valuable consideration, other than the equity received by Owner from Company (pursuant to such separate Stock Option and/or Purchase Agreement(s) between the Parties and/or between Owner and Company Affiliates), for the inclusion of any matter in connection with the Owner Services or for the endorsement of any company, product or service in connection with the Owner Services. Any **cash amounts paid or payable for Owner's** rendering of the Owner Services will be as determined by the Company in good faith. Further, Owner shall not visibly wear any Competitor's product (as outlined herein) name or logo during the provision of the Owner **Services hereunder, without Company's prior** written consent. If Company approves the inclusion of any logo or trademark, including those logos or trademarks that may be proprietary to Owner, then Owner, on behalf of itself and the applicable third party rights holders, hereby grants Company the right and license to include such logo or trademark in the exhibition, promotion, advertising, merchandising and other exploitation of the Owner Services.

   g. Owner will participate in Company sponsorships, branded campaigns, events, appearances, and/or obligations to Company, Company Affiliates, and all commercial partners thereof, as requested by Company and/or Company Affiliates, in the following categories: non-alcoholic beverages, Personal Computers (PC), Quick Service Restaurants (QSR), automobile, fintech, cryptocurrencies, and telecommunications. Such participation by Owner includes, but is not limited to, activations as reasonably requested by Company, and use of Company-provided Twitch overlay and panel banners, logos on social media banners, chat commands, and automated chat messages. Owner shall seek and be required to obtain written authorization from Company, such authorization shall be the sole determination of

DocuSign Envelope ID: 2A950F60-95F8-4623-8DA2-811CEB992548

Company, prior to agreeing to deliver any service to any third party that operates within any of the above-referenced industry categories, whether in whole or in part. Owner agrees that it shall interpret each category broadly and seek guidance from the Company to the extent an opportunity is in even a remote or potential conflict with the exclusive categories.

2. Intellectual Property.

   a. Proprietary Information and Inventions Agreement. Owner acknowledges that it is subject to the terms of the Proprietary Information and Inventions Agreement by and between the Parties made effective upon Owner's first day of its engagement with Company ("**PIIA**"), and that Owner is subject to certain terms and conditions of the PIIA during and after the term of Owner's engagement with the Company, including, but not limited to Section 2 (Inventions), Section 3 (Proprietary Information), and Section 4 (Restricted Activities). Owner agrees that its actual or threatened breach of any material term of the PIIA shall constitute a breach of this Agreement and entitle the Company to seek all available remedies, including as set forth in Section 4 below. In the event this Agreement is terminated pursuant to this Section, Company shall have the right to repurchase any such equity that Owner accrued during Owner's engagement with Company and/or any Company Affiliate pursuant to Section 4(f)(i) below.

   b. Third Party Materials. Owner shall not use or incorporate any materials, content, copyrights, trademarks, designs, logos, insignia, or any other intellectual property of any third party ("**Third Party Materials**") in connection with the Owner Services without Company's prior written consent. Provided such consent is granted, Owner shall be responsible for: (i) obtaining all rights in and to (including, without limitation, any rights of publicity/privacy) any such Third Party Materials; and (ii) shall make all related payments with respect to any clearances, permissions or consents necessary to use any such Third Party Materials.

   c. Owner Name and Likeness. From the time Owner holds equity in Company and/or a Company Affiliate (including indirect ownership) and continuing throughout the term of Owners engagement with the Company and/or any Company Affiliate, Owner hereby grants to Company and each Company Affiliate an exclusive, transferrable, assignable,

sublicensable, royalty free, fully paid, universal right and license, but not the obligation, to photograph, film, tape, record and otherwise use, and authorize others to use Owner's name(s), voice, image, photograph, personal characteristics, signature, actual or simulated likeness, expressions, performance, attributes, personal experiences and biographical information (collectively "**Name and Likeness**"), and reproduce, edit, subtract from, add to, modify or juxtapose or otherwise use Name and Likeness in any manner in connection with (i) the advertising, publicity, promotion, merchandising, exhibition, and other exploitation of the Owner Services, and (ii) all versions and formats and the businesses, services, programs and/or products of Company, the Company Affiliates, and their licensees, sublicensees, assigns, advertisers and sponsors (including all advertising, publicity, promotion and materials associated therewith), in any manner, in any and all media and by any means now known or hereafter devised (including, but not limited to, use in and in connection with publishing, by-products, tie-ins, merchandise, commodities and services of every kind). Without limiting the generality of the foregoing, Company may include photographs or other images or depictions of the Name and Likeness of Owner in or in relation to any exploitation of the Owner Services, including any promotional films, reels and videos in any manner and by any means throughout the universe in all media now known or hereafter devised. Owner acknowledges that neither Company, nor Company Affiliates, including any licensees thereof, shall be required to stop exploiting, distributing, displaying, transmitting, posting, publishing/re-publishing, selling, or otherwise making use of any matter created in compliance with this Agreement.

   d. Company Intellectual Property. Owner shall not use any name, logo, trademark or other proprietary mark of Company or a Company Affiliate ("**Company IP**") or their parents, subsidiaries, affiliates, licensees, sublicensees and/or assignees in any manner without Company's prior written approval. Owner acknowledges and agrees that in the event Company grants written approval for Owner to use any Company IP, Company may require Owner to remove any and/or all Company IP for any reason and at any time and Owner shall comply immediately; such removal may require Owner to remove any mention, relationship or

DocuSign Envelope ID: 2A950F60-95F8-4623-8DA2-811CEB992548

affiliation with Company and/or Company Affiliate on each and every one of the Owner's social media channels, including, as applicable, Twitch, YouTube, Instagram, TikTok, Snap, Facebook, etc., in Company's sole discretion. Owner's failure to promptly comply with any such request shall be deemed a material breach of this Agreement and shall entitle Company to obtain all available remedies, including, without limitation, those set forth in Section 4 below. In the event this Agreement is terminated pursuant to this section, Company shall have the right to repurchase any such equity that Owner accrued during Owner's **engagement with Company** and/or any Company Affiliate pursuant to Section 4(f)(i) below.

3. Exclusivity. From the time Owner holds equity in Company and/or Company's affiliate(s) and for as long Owner holds any equity in Company or Company Affiliate, unless Owner has obtained Company's prior written consent, Owner shall not: (i) provide services or otherwise work for or be employed or contracted by any: (1) gaming and/or online content creator organization, affiliation, collective, Media Company (for the purposes hereunder, "**Media Company**" shall mean any privately or publicly held businesses or parts thereof which, directly or indirectly, creates, produces, distributes or sells information or entertainment products, or any other communications facility which owns, controls or operates media, including, but not limited to, print, news, radio, film and/or broadcast, digital or cable television, or other communication stations, channels, or multichannel distribution systems), and/or team, (2) video game development studios or publishers (except for traditional sponsored stream activations or similar promotional activities), (3) non-alcoholic beverage brands, manufacturers, or distributors, (4) Personal Computers (PC), (5) Quick Service Restaurants (QSR), (6) automotive manufacturers, dealers, or retailers (including automobiles, automotive rental, and automotive parts and services), (7) fintech and cryptocurrencies, (8) telecommunications, and (9) any such other product, service, or industry category that Company and/or Company Affiliate and Owner agree to include pursuant to a writing referencing this Agreement (collectively, "**Competitors**"); (ii) appear in, sponsor or be sponsored by, or otherwise promote or endorse, directly or indirectly, any brands, products or services of Competitors, unless such brands, products and services are approved in writing by Company; (iii) promote, sponsor, endorse (using Owner's Name and Likeness or otherwise) or render services for or on behalf of any companies to promote products or services competitive with a product or service of Company or a sponsor or advertiser of Company within the meaning of Competitors set forth in this Section 3.a.

4. Termination.

a. Owner Incapacity. An event of Owner incapacity shall be deemed to occur if Owner is unable to fully render the Owner Services in accordance with the terms of this Agreement as the result of any physical, mental or other impairment (e.g., Owner's **illness causing** physical or mental disability, or impairment of Owner's **voice, appearance and/or mobility**) ("**Owner Incapacity**"). Without limiting any other rights of Company under this Agreement, in the event of Owner Incapacity, (i) Company shall not be obligated to pay or credit Owner with any cash or equity compensation during such Owner Incapacity and (ii) Company shall have the right to suspend this Agreement during such period of Owner Incapacity. If any Owner Incapacity continues for at least seven (7) days in the aggregate, Company, by a vote of the majority of the Company's then-current Board of Directors, shall have the right to terminate this Agreement without any further obligation to Owner except for payment of compensation for all Owner Services satisfactorily completed prior to the effective date of such termination.

b. Termination for Convenience by Company. Company, by a vote of the majority of the Company's then-current Board of Directors, may terminate this Agreement at any time by written notice to Owner. Owner shall be paid for all Owner Services satisfactorily completed prior to the effective date of such termination.

c. Termination for Morals Breach. In the event that Owner takes any action that as alleged: (i) constitutes a felony or an offense involving moral turpitude under federal, state or local laws or (ii) in Company's sole discretion, (A) brings Company, Company Affiliate, Owner, or any sponsor, partner, or joint venturer of Company or Owner, or any of their respective affiliates, employees, representatives, and agents (collectively, the "**Company Parties**"), into public disrepute, contempt, scandal, or ridicule, or (B) insults or offends the community or any substantial group thereof, or (C) might tend to injure the success of any **Company Party's** products or services, then at the time of any such action or at any time thereafter Company learns of any such action, Company shall have the right, at its sole and absolute discretion by a vote of the

{NL013549.1}

majority of the Company's then-current Board of Directors, to immediately terminate Owner's engagement with Company by written notice to Owner and Company shall have no further obligation or liability to Owner with respect to payment of any compensation in connection with any Owner Services rendered following the date upon which such action occurred. Company's decision on all matters arising under this paragraph shall be conclusive and binding upon Owner. In the event this Agreement is terminated pursuant to this section, Company shall have the right to repurchase any such equity that Owner accrued during Owner's engagement with Company and/or any Company Affiliate pursuant to Section 4(f)(i) below.

d.  Termination for Material Breach. Company shall have the right, by a vote of the majority of the Company's then-current Board of Directors, to terminate Owner's engagement with Company if Owner commits a material breach of its representations, warranties, covenants or other obligations hereunder. If such breach is able to remedied, as determined in Company's sole discretion, and Owner fails to remedy such material breach within a period of thirty (30) days after being notified in writing to do so from Company, such termination shall be effective upon the expiration of such thirty (30) day period. Otherwise, termination shall be effective immediately upon notice thereof. In furtherance of the foregoing, Company will also have the right to terminate Owner's engagement with Company and any Company Affiliate for an "**Owner Material Breach**," which for purposes of this Agreement includes, without limitation: (i) Owner making disparaging remarks about the Company and/or a Company Affiliate, including any party involved with the Company or Company Affiliate, any sponsor or other commercial partner, or any of their respective employees, agents or assigns; (ii) failure, refusal, or neglecting to perform the Owner Services at the times and places and in the manner required or to fulfill Owner's other obligations under this Agreement; (iii) Owner's breach of the confidentiality provisions of this Agreement; (iv) Owner's breach of the non-compete provisions of this Agreement; (v) Owner's express or implied promotion of other brands other than those brands approved by Company; (vi) Owner appearing visibly intoxicated and/or under the influence of any illegal substance while performing any of the Owner Services; or (vii) any actual or threatened breach of the PIIA

or Social Media Policy. Upon termination for an Owner Material Breach or otherwise pursuant to this subparagraph, Company shall have no further obligation to Owner (including, but not limited to, any obligations to pay any further compensation). In the event this Agreement is terminated pursuant to this section, both Company and each Company Affiliate shall have the right to exercise the repurchase remedies pursuant to Section 4(f)(i) below.

e.  Obligations Upon Termination. Upon termination of Owner's engagement with Company for any reason, Owner shall promptly provide Company all documents or other media containing Confidential Information, and all equipment Owner has received from Company during the term of the engagement; provided, that, at Company's election, Owner can pay for such equipment instead of returning it to Company. Unless termination is pursuant to an Owner Material Breach, Company shall remit to Owner the applicable compensation for Owner Services rendered through the effective date of termination. Company's use of the Owner Services after termination of the Owner's engagement with Company shall not be deemed a reinstatement or renewal of this Agreement without the written agreement of the Parties hereto.

f.  Equity Upon Termination. Owner hereby grants to Company two (2) additional rights of repurchase regarding the equity as described in such separate Stock Option and/or Purchase Agreement(s) between the Parties and/or between Owner and Company's Affiliate.

    i.  Owner Breach. In the event this Agreement are terminated pursuant to Owner's breach of Sections 4.c (Morals Breach) or 4.d (Material Breach), Company shall have the right, but not the obligation, to repurchase any and all (i.e., up to 100%) of such vested or unvested equity in Company and/or Company Affiliates, in whole or in part, that Owner accrued during Owner's engagement with Company through the date of such breach. Company may repurchase any and all capital stock, options, convertible securities, and any other equity that Owner or any affiliate thereof holds in Company or any Company Affiliate and pay an amount to Owner that is the lesser of: (i) equal to the then-current fair market value of the equity, or (ii) a per share price equal to the amount obtained by applying a valuation equal to one times (1x) the Company's revenue in

the prior calendar year, as determined by the Company in its reasonable discretion. For the avoidance of doubt, unvested equity will be subject to repurchase by the Company at a price per share equal to the amount paid or payable by the Owner with respect thereto. In the event Company repurchases Owner's equity pursuant to this section of the Agreement, Company shall issue Owner a promissory note whereby Company shall provide the purchase price of such equity to Owner in four (4) equal annual installments at an interest rate of one percent (1%); provided, however, if Owner violates any surviving term or condition of this Agreement, Company shall have the right to immediately terminate and/or cancel such promissory note and Owner shall return any funds remitted to it by Company pursuant to such promissory note as liquidated damages for the Owner's breach of such surviving terms. For the avoidance of doubt, any unvested capital stock or equity held by or on behalf of an Owner will be repurchased at an amount equal to Owner's cash payment therefore or par value, as applicable.

ii. Competitors. In the event that Owner provides services to, works for or becomes employed by a Competitor, or promotes, sponsors, endorses or renders services for or on behalf of any Competitor at any point during Owner's engagement with Company and for such time thereafter as required to remain in compliance with this Agreement, Company may repurchase any and all capital stock, options, convertible securities, and any other equity that Owner or any affiliate thereof holds in Company or any Company Affiliate and pay an amount to Owner that is the lesser of: (i) equal to the then-current fair market value of the equity, or (ii) a per share price equal to the amount obtained by applying a valuation equal to one times (1x) the Company's revenue in the prior calendar year, as determined by the Company in its reasonable discretion. For the avoidance of doubt, unvested equity will be subject to repurchase by the Company at a price per share equal to the amount paid or payable by the Owner with respect thereto. In the event Company repurchases Owner's equity pursuant to this section of the Agreement, Company shall issue Owner a promissory note whereby Company shall provide the purchase price of such equity to Owner in four (4) equal annual installments at

an interest rate of one percent (1%); provided, however, if Owner violates any surviving term or condition of this Agreement, Company shall have the right to immediately terminate and/or cancel such promissory note and Owner shall return any funds remitted to it by Company pursuant to such promissory note as liquidated damages for the Owner's breach of such surviving terms. For the avoidance of doubt, any unvested capital stock or equity held by or on behalf of an Owner will be repurchased at an amount equal to Owner's cash payment therefore or par value, as applicable.

5. Representations and Warranties.

a. Owner Representations and Warranties. Owner hereby represents and warrants to Company that: (i) it has the full right and authority to enter into this Agreement and furnish the Owner Services as required hereunder and grant to Company the rights granted hereunder including, but not limited to, in the Name and Likeness without the permission of, or obligation to, any third party; (ii) it has not entered into any agreement, oral or written, express or implied, which could conflict with this Agreement ; (iii) all material furnished by, and all Owner Services rendered by Owner hereunder shall comply with Company's rules and policies and shall not violate the civil or proprietary rights of others; (iv) any Third Party Materials used or provided by Owner under this Agreement will not violate the rights of any third party, including, without limitation, intellectual property rights; (v) to the extent required hereunder, it has obtained or will obtain all rights, clearances, permissions, consents and releases related to any Third Party Materials used and/or incorporated hereunder; and (vi) it will at all times be in compliance with all applicable state and federal laws, FTC guidelines, the Social Media Policy, and foreign anti-corruption and anti-bribery laws.

b. Company Representations and Warranties. Company hereby represents and warrants to Owner that: (i) it has full right and authority to enter into this Agreement; and (ii) it will at all times be in compliance with all applicable state and federal laws.

6. Indemnification; Limitation of Liability.

a. Indemnification. Each Party shall at all times indemnify, defend and hold harmless the other party, its affiliated companies, partners and parent companies, and each of their respective

DocuSign Envelope ID: 2A950F60-95F8-4623-8DA2-811CEB992548

officers, directors and employees, from and against any and all liabilities, claims, costs, damages, reasonable settlements and expenses (including without limitation reasonable attorneys' fees and court costs) brought by a third party, to the extent arising out of or attributable to any material breach or allegation which, if true, would constitute a material breach of such Party's obligations or representations and warranties hereunder. If it so elects, the indemnified party shall have the rights at its sole cost to engage its own counsel in connection with such claim or may assume defense on its own behalf in the event the indemnifying party fails to adequately defend or if the indemnified party's insurance carrier requires that such carrier defends any claim as a condition of coverage. The obligations under this subparagraph shall survive the termination or expiration of this Agreement.

b. Company Liability Limitation; Injunctive Relief; Set-Off. Owner agrees that the rights and remedies of Owner in the event of a breach of this Agreement by Company shall be limited to the right to recover money damages, if any, in an action at law and in no event shall Owner be entitled to enjoin or restrain the exploitation of the Owner Services. The rights granted by Owner under this Agreement shall not terminate by reason of any such breach hereof by Company. Owner agrees that the Owner Services provided by Owner are of a special, unique, unusual, extraordinary and intellectual value and character, the loss of which would cause Company irreparable harm and could not be adequately compensated by money damages in an action at law. Company shall be entitled to seek injunctive and other equitable relief to restrain, enjoin or prevent any breach or threatened breach of any obligation herein by Owner, in addition to any other rights that Company may have in equity or at law. In the event Company incurs any damages as a result of any breach of this Agreement by Owner, Company shall have the right, in addition to any other remedies, to withhold and offset any payments due Owner under this or any other agreement between the parties in an amount reasonably necessary to cover Owner's indemnity obligations under this paragraph or to cover any damages incurred by Company.

7. Confidentiality; Statements by Owner.

a. Owner acknowledges and agrees that Owner will be provided with and/or gain access to and

become acquainted with non-public, proprietary and/or confidential information concerning the finances, operations, sponsors, technology, sales and marketing techniques, customers, suppliers, know-how, business plans, prospects of and other information related to: (i) the Company's business, operations and/or sponsors, (ii) the Company's business partners, including without limitation: (A) confidential personal and/or business information and business secrets of the Company; (B) trade secrets of the Company; (C) plans, prospects, policies, practices, and procedures of the Company; (D) licenses and agreements of any nature; (E) the existence of the discussions between the parties related to this Agreement and (iii) all other proprietary and confidential information of every nature and source (collectively, "**Confidential Information**"). Owner shall not disclose to any third party any information with respect to such Confidential Information or with respect to the terms and provisions of this Agreement, except: (i) where such information has already been released to the public by Company; (ii) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction or government agency, provided Owner notifies Company of said law or order in advance of such disclosure; or (iii) on a must-know basis to Owner's representatives upon the express condition that Owner shall in such cases secure said representatives' agreement to comply with this confidentiality restriction. The terms of this Agreement shall be deemed Confidential Information of Company.

b. Other than as provided for in this subparagraph, Owner and/or Owner's representatives shall not issue any press releases nor make any other statements about the Owner Services, the Company, its affiliates, agents and/or employees, or any other party involved in the Owner Services (e.g., current Owners of the Company) in any media (including, without limitation, any online or print communications) without Company's prior written consent. Owner and/or Owner's representatives may not disclose any Confidential Information relating to the Owner Services and/or the content or existence of this Agreement. Further, Owner and/or Owner's representatives shall not use any name, logo, trademark or other proprietary mark of Company or their parents, subsidiaries, affiliates, licensees, sublicensees and/or assignees in any manner without Company's prior written approval.

c. The confidentiality obligations set forth in this Agreement shall survive the term of Owner's engagement with Company for as long as Owner holds any Equity in the Company or Company Affiliate plus a period of four (4) years thereafter.

d. <u>Owner Acknowledgement</u>. Owner understands that Company is involved in the entertainment industry. Owner further understands that because Company's business requires a creative working environment, including exposure to potentially offensive speech, Owner may be exposed to conduct and speech that openly and explicitly relates to sex, race, sexual orientation, gender, national origin, religion, disability and age (collectively, **"Blue Comedy"**). Owner acknowledges that he/she may be privy to conversations where Blue Comedy is utilized. Owner expressly agrees and represents that he/she does not object to being exposed to Blue Comedy, and that he/she is willing to work in such an environment.

e. <u>Non-Disparagement</u>. From the commencement of the Term and continuing through the period of time that is four (4) years after Owner no longer holds any equity in Company and/or any Company Affiliate, Owner agrees not to disparage, denigrate, portray in an unfavorable light, libel, slander, defame, or reflect negatively on Company, its Board of Directors, employees, shareholders, consultants, members, affiliates, and/or any party involved with the Company, any sponsor or other commercial partner, or any of their respective employees, agents or assigns, or their products or services.

8. <u>Notices</u>. All notices hereunder shall be in writing and shall be served by personal delivery to either Party, by regular mail or electronic mail, to the respective addresses of the Company and the most recent contact information Owner has made available to Company.

9. <u>Assignment</u>. This Agreement may be assigned, in whole or in part to any person, firm or corporation which acquires all or substantially all of Company's or a Company's Affiliates assets or which is owned or controlled by Company. Owner's services are personal and Owner shall not have the right to assign this Agreement.

10. <u>Independent Contractor</u>. Notwithstanding any provision hereof, for all purposes of this Agreement each Party shall be and act as an independent contractor and not as partner, joint venturer, employer, employee or agent of the other and shall not bind nor attempt to bind the other to any contract. Each Party is solely responsible for all of its own employees, subcontractors, labor costs and, except as otherwise provided herein, expenses (including without limitation timely payment of all income taxes, payroll taxes and related withholdings) arising in connection therewith.

11. <u>Miscellaneous</u>. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles. Exclusive jurisdiction and venue for any action arising under this Agreement is in the federal and state courts located in Austin, Texas, and both parties hereby consent to such jurisdiction and venue for this purpose. This Agreement, together with all other exhibits, schedules and attachments referenced herein or therein, contains the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes and cancels all previous negotiations, agreements, commitments, and writings in respect thereto. Upon any expiration or termination of this Agreement, Sections 2-4, 6-9 and this Section 11 will survive. This Agreement (including, all terms and conditions referenced herein) may be supplemented or amended, and the observance of any provisions hereof may be waived (either generally or any particular instance, and either retroactively or prospectively) only with the written consent of both Parties. Failure of a Party to enforce its rights hereunder will not be construed as a waiver of such rights. All remedies, whether at law, in equity, or pursuant to this Agreement will be cumulative. This Agreement may be executed in two or more counterparts (including by facsimile or e-mailed PDF), each of which shall be deemed an original, but which together shall constitute one and the same instrument and will become effective when one or more such counterparts have been signed by each Party and delivered to the other Party. Headings are for convenience of reference only and shall in no way affect interpretation of this Agreement. Each Party acknowledges that, in executing this agreement, such Party has had the opportunity to seek the advice of independent legal counsel.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

DocuSign Envelope ID: 2A950F50-95F8-4623-8DA2-511CEB992548

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the Effective Date.

**Company: OTK Media, Inc.**



Title: Chief Operating Officer

**Owner: Matthew Misrendino**

By: _Matthew Misrendino_

Matthew Misrendino

{NL013549.1}

DocuSign Envelope ID: 2A950F60-95F8-4623-8DA2-811CEB992548

## SCHEDULE I
## SOCIAL MEDIA POLICY

The following Social Media Policy shall apply to Owner (referred to as "You" below) in connection with the Owner Services and this Agreement. The Social Media Policy may be updated from time to time by Company upon written notice to Owner:

You agree that when using any sites in connection with performing the Owner Services, you will act in a manner consistent with the goals of the Company, and by way of example, and not as a limitation, you specifically agree that:

1. You will not bring Company (or any of its employees, agents, clients, talent, representatives or partners ("Affiliates")) into public disrepute, contempt, scandal, or ridicule.

2. You will not violate any applicable local, state, national or international law, including but not limited to any rule, regulation, decree or ordinance.

3. You will not post information on or download information from any site unless you have all rights and authority necessary to do so.

4. You will not post any inappropriate, defamatory, vulgar, obscene, sexually explicit, potentially libelous or slanderous, infringing, harmful, harassing, threatening, illegal, anything relating to death or other material or information that any site views as objectionable to such site, including but not limited to text, graphics, audio and video files.

5. You will not defame, abuse, harass, stalk, threaten, embarrass, cause distress, unwanted attention or discomfort or otherwise violate the legal rights (including without limitation rights of privacy and publicity) of any other user or representative of such site, or Company.

6. You may express your disagreement with someone's point-of-view but personal attacks, or attacks based on another person's race, national origin, ethnicity, religion, gender, sexual orientation, disability or other such condition or circumstance, are strictly prohibited.

7. You will not impersonate another person or entity, including but not limited to a representative of Company, or communicate under a false name or a name that you are not entitled or authorized to use.

8. You will not post surveys, contests, chain letters, pyramid schemes, unnecessarily long messages, unnecessary or repetitive posts, multiple ratings for the same item, meaningless text, spamming, offensive declarations or other similarly disruptive content.

9. You will not falsify or delete any author attributions, legal or other proper notices or proprietary designations or labels of the origin or source of software or other material posted on any site.

10. You will not directly or indirectly disparage any other Company Owner, Company or any of its Affiliates.

{NL013549.1}

# EXHIBIT 3

DocuSign Envelope ID: AAD00A16-53E4-43C3-829A-9C04885D65AE



1/2/2023

Matthew Misrendino
Mizkif Enterprises

**Re:**    **Mythic Talent Management Representation**

Dear Matthew Misrendino:

This letter agreement ("Agreement") shall confirm that you ("Client") have authorized Mythic Talent Management, Inc ("Mythic") to act as Client's sole and exclusive agent during the Term, throughout the world, on the terms set out in this Agreement. Client and Mythic may individually and collectively be referred to herein as a "Party" or "Parties". We welcome you to Mythic and look forward to working with you!

The term of this agreement shall commence on the date written above, and shall extend for a period of one (1) year (the "Term") or until terminated by either party. Either Party may terminate this Agreement with thirty (30) days' written notice to the other Party. Upon the expiration of the Term, this Agreement shall automatically renew for successive one (1)-year periods, unless either Party notifies the other in writing of its intent not to renew this Agreement at least thirty (30) days prior to the renewal date.

During the Term, Mythic shall use all reasonable endeavors to advance Client's career and generally render all services customarily rendered by an agent within the industries of digital media content creation and entertainment. Mythic shall use reasonable efforts to manage, develop, negotiate, organize and administer all income producing opportunities and activities available to Client within and related to the digital media, gaming, content creation and entertainment industries, including, but not limited to, opportunities in the following areas: digital media platforms (e.g. Twitch, YouTube), podcast, personal appearances and performances, motion pictures, television, speaking engagements, commercials, marketing/endorsements, sponsorships and publishing. Mythic may also: (i) advise and consult with Client regarding the creation, development, financing, production and other exploitation of particular entertainment or other projects; and (ii) assist in bringing together key elements of such projects. Mythic will also make reasonable efforts to connect Client with suitable financial and legal experts related to Client's professional business interests if needed. Collectively, these are the "Agent Services". Mythic shall act in good faith at all times in the performance of the Agent Services and keep the Client reasonably informed of Mythic's activities on the Client's behalf. During the Term the Mythic shall negotiate all offers in respect of the Client's Commercial Services (as defined below), but shall not execute any agreement on the Client's behalf without the prior written consent of Client. Mythic hereby accepts this engagement and agrees to perform the Agent Services specified herein. Client shall not retain any third party to perform services comparable to the Agent Services, in kind, nature, or in any industry or use of Client's name, image, likeness, business venture, or otherwise, without Mythic's advance written consent.

In exchange for performing the Agent Services, Client agrees to pay Mythic the following (as and to the extent applicable): fifteen percent (15%) (the "Commission Rate") of all of Client's Gross Compensation. "Gross Compensation" shall mean all earnings, whether in the form of income (including but not limited to, advances, salary, bonuses, or any other kind or type of income) royalties, interest percentages, share of profits, and/or share in ventures, stock, equity, or other securities, products, joint ventures, or properties for which the Agent Services play any role in obtaining, managing, or facilitating, in all media, products, and services now known or hereafter devised (the "Management Fee"). The Management Fee due under this Agreement will be calculated by multiplying the Commission Rate by the total Gross Compensation. For the sake of clarity, Gross Compensation shall not include any donations received by the Client.

{230043.1}

DocuSign Envelope ID: AAD00A16-63E4-43C3-929A-9C04885D65AE

The Management Fee applies to any contracts entered during the Term or after the Term if arising from the Agent Services performed during the Term, or from the Agent Services performed within six (6) months of the expiry of the Term pursuant to an arrangement made by the Mythic during the Term. The foregoing includes any and all extensions, options, renewals, modifications, replacements thereof or substitutions thereto. For the sake of clarity, Client acknowledges that the Management Fee is payable to Mythic whether income from such contracts is received by Client during or after the Term.

Mythic will have the right, upon receipt of payment on Client's behalf, to deduct any commission due by Client to Mythic before delivering the remaining portion of such payment to Client. In the event Client is paid before such commission is deducted, Client will pay Mythic the commission within thirty (30) days of Client's receipt of such payment. Any overdue commissions will bear interest at the rate of five percent (5%) per year, including, for the avoidance of doubt, on any delay incurred by Mythic in the timely collection and remittance of fees earned by Client.

Client understands and hereby acknowledges that Mythic may render similar services to others, including those that may be competitive with Client. Unless this Agreement is terminated or otherwise expires, Client agrees not to engage any other person, firm, or corporation to act for Client in the capacity in which Client has engaged Mythic (i.e., as Client's representative in respect of any of Client's commercial activities throughout the world, including all endorsements, merchandising and sponsorship activities (the "Client's Commercial Services")) without Mythic's prior written approval. The forgoing shall not prohibit Client from appointing a legal representative and financial adviser from time to time, but such permitted advisors shall not procure, organize, manage, or source any of Client's Commercial Services without Mythic's advance written consent. The Client shall promptly refer to Mythic all inquiries received in connection with Client's Commercial Services, whether received by Client or by another person on the Client's behalf. Client agrees Client will not attempt to negotiate, agree to, or sign any agreement offered pursuant to such inquiries without Mythic's involvement, and that any such opportunities organized by Client in breach of the foregoing shall remain subject to the Commission Rate. The Client shall perform to the best of the Client's abilities all Client approved engagements that Mythic has arranged on the Client's behalf.

Client hereby represents and warrants: (i) that Client is free to enter into this Agreement and that Client does not have and will not have any contract or obligation that will conflict herewith; (ii) Client is not a minor; (iii) Client shall indemnify Mythic against all liabilities, costs, expenses, damages and losses (including legal fees) that Mythic may suffer as a result of the breach of any warranty contained in this Agreement. Client agrees that Mythic may represent other Mythic clients in negotiations for projects with which Client is involved and such other Mythic personnel will be acting solely as the representative of such other Mythic client and not as Client's representative. Neither the representation of such other clients by Mythic nor Mythic's receipt of compensation from them shall be construed as a breach of the obligations of Mythic or of any fiduciary or other relationship between Client and Mythic under this Agreement. In the event that such matter were to arise, Mythic firmly suggests that Client and the other client(s) engage their professional advisors to ensure that Client has adequate opportunity to be fully advised.

Client acknowledges and agrees that this Agreement's value to Mythic is based in large part on the goodwill and positive publicity generated by Client and Mythic, and as such Client agrees that: (i) Client shall behave in a manner so as to prevent a material adverse change in such goodwill and positive publicity; (ii) Client will not malign or disparage Mythic; and (iii) Client shall not act in an unprofessional manner or commit any act or becoming in any situation that is criminal, causes scandal or ridicule or tarnishes Mythic's or Client's brand or reputation. Client also agrees to: (a) comply with all applicable laws, rules, and regulations, as well as all terms of service and other applicable policies of any social media platform; (b) not violate, misappropriate or infringe the rights of any third party; and (c) not give rise to any cause of action for libel, slander, defamation, or other similar claim.

It is understood that Client's status hereunder is that of an independent contractor and that Client in performing its obligations hereunder will not be deemed an employee of Mythic. As an independent contractor, Client shall not, and Client hereby waives any right to, participate in or receive any benefits under any compensation arrangement or employee benefit plan sponsored, maintained or contributed to by Mythic, regardless of whether or not Client subsequently is reclassified as an employee of Mythic pursuant to Internal Revenue Service rule, regulation or the interpretation thereof, or otherwise.

DocuSign Envelope ID: AAD00A16-63E4-43C3-929A-9C04885D65AE

The terms and conditions of this Agreement shall be maintained as confidential and shall not be disclosed to any third party by Mythic or Client (except for the attorneys, accountants and other acknowledged representatives of each respective Party) without the prior written consent of the other Party, unless otherwise required by law.  Any disclosures to the general public or press releases by Mythic or Client in connection with this Agreement shall be subject to the prior written consent of the other Party.

This Agreement shall be governed and construed in accordance with the laws of the State of Texas without regard to its conflicts of law provisions.  All disputes and controversies of every kind and nature whatsoever between Mythic and Client arising out of, or in connection with, Mythic's representation of Client (including without limitation commission disputes) shall be finally determined by binding arbitration conducted in accordance with the Streamlined Arbitration Rules and Procedures of JAMS. Any such arbitration shall be conducted by a single, neutral arbitrator, selected from the JAMS' panel of arbitrators. If the parties cannot agree upon an arbitrator after good faith discussion, the arbitrator shall be chosen by JAMS pursuant to the requirements of this paragraph. The parties agree that the arbitrator's ruling in the arbitration shall be final and binding and not subject to appeal or challenge. The parties further agree that the arbitration proceedings, testimony, discovery and documents filed in the course of such proceedings, including the fact that the arbitration is being conducted, must be treated as confidential and must not be disclosed to any third party to such proceedings, except the arbitrator(s) and their staff, the parties' attorneys and their staff, and any experts retained by the parties; provided that such arbitrator(s) and their staff, the JAMS and its staff, the parties' attorneys and their staff, and any experts retained by the parties.

Client may not assign, transfer, or delegate any rights, duties or obligations under this Agreement, in whole or in part, to any person or entity without the prior written approval of Mythic. Mythic may assign or transfer this Agreement or all of its rights and obligations under this Agreement without Client's consent to an affiliate, parent or successor-in-interest as a result of a merger or consolidation or in connection with the sale or transfer of all or substantially all of it business or assets to which this Agreement relates.

Client and Mythic hereby acknowledge and agree that the foregoing are the material terms of this Agreement. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

We welcome you to Mythic and look forward to working with you!

Very truly yours,

William Lucas
Mythic Talent Management, Inc.
Chief Executive Officer

Agreed to and Accepted:

DocuSigned by:

By: _Matthew Misrendino_

Matthew Misrendino
Mizkif Enterprises

{230043.1}                                         3

# EXHIBIT 4



November 6, 2023

**Via Email and Regular Mail**

Mr. Matthew Misrendino
c/o Mizkif Enterprises LLC



*Re: Notice of Termination and Repurchase from OTK*

Dear Matt:

As a condition of your return to OTK Media, Inc. ("OTK") and its affiliates (e.g., King Gaming Labs) (collectively, the "Company") in December 2022, you agreed that you would be on 'probation', whereby your conduct would be under closer review by the Company to ensure that you were acting in a professional manner and in such a way as to uphold the Company's core values.

Recently you have been involved in two (2) separate incidents in which you engaged in acts of violence and/or physical force and the Company is taking this very seriously. In one instance, you were witnessed by Company personnel engaging in forceful and unwanted physical contact with a Company employee. In another instance, you admitted to Company personnel that you had engaged in acts of physical violence with another member of the streaming community. Among other things, your conduct exposes the Company to present and future liability, will bring OTK into disrepute or scandal in the industry and community, and that such conduct will further injure the value of OTK's services in the eyes of its sponsors and brand partners.

Your recent conduct runs completely counter to the Company's core values. In light of the seriousness of these events, and that they occurred while you were still on probation, OTK's Board of Directors ("Board") has unanimously determined that you have materially breached your Owner's Agreement dated October 20, 2022 ("Owner's Agreement"), and OTK has elected to take various actions in response. Effective immediately, your employment will be terminated from OTK, you will no longer be publicly affiliated with OTK, you will be removed from its Board, and shares of OTK stock held by you will be repurchased on such terms and as set forth in the promissory note attached as Exhibit A and in accordance with the Owner's Agreement.

At this time, the Company is only terminating the Owner Agreement on behalf of OTK but not the Company Affiliate parties (e.g., King Gaming Labs, Inc.). Except for your limited termination from OTK, all other existing agreements that you have with Company will not terminate and will remain in full force and effect (including, without limitation, your LOA Letter, Owners Agreement and PIIA) (collectively, the "Existing Agreements"), and you are expected to continue to render all Services for the Company (other than OTK itself).

{NL015002.5}



When you were invited back from your leave of absence, you agreed in your LOA Letter that Company shall have certain rights, should you violate your Existing Agreements, such as the option to repurchase any Company equity (vested and unvested) that you have accrued during your engagement. The Company hereby notifies you that it is exercising its right to of repurchase and the repurchase price for such shares will be paid to you in accordance with the terms of a promissory note, which is attached as Exhibit A. The Company is opting to not repurchase your shares in Company Affiliate, King Gaming Labs, Inc., at this time, but reserves the right to do in the event of a future breach by you of the Owners Agreement.

The terms of this Letter are confidential information of the Company protected from disclosure pursuant to Existing Agreements between you and Company. As such, you shall not divulge, publish or otherwise communicate the terms of this Letter or any Existing Agreement. Any public messaging, if any, in connection with your relationship with the Company, shall be subject to Company's approval thereof, and any actual or threatened breach of confidentiality by you will be met with swift legal action by the Company. In no way has Company and/or any Company legal representative provided you with any sort of legal advice or recommendation regarding your termination from OTK.

If you should have any questions regarding this letter, please contact me.

Very truly yours,

**OTK MEDIA, INC.**



Title: Chief Executive Officer

{NL015002.5}

# EXHIBIT 5



November 6, 2023

## **PROMISSORY NOTE**

**WHEREAS,** pursuant to that certain Notice of Termination and Repurchase, of even date herewith (the "Repurchase Notice"), by and among OTK Media, Inc., a Texas corporation having an address █ ("OTK"), and Matthew Misrendino, an individual with an address at ("Misrendino"), hereby covenants and promises to pay pursuant to the terms of this Promissory Note ("Note"). Unless otherwise defined herein, all capitalized terms shall be as defined in the Letter; and

**NOW, THEREFORE, FOR VALUE RECEIVED,** OTK, hereby promises to pay Misrendino pursuant to and in accordance with the terms of the Repurchase Notice, up to the aggregate principal sum of ████████████████████████████████████████
████ in four (4) equal installments, together with interest thereon computed from the date hereof at the rate of one percent (1%) per annum on the principal payments as set forth on attached Schedule A, for Misrendino's entire holding of OTK Class B Common Stock (the "Shares"), which is equal to █

1. Payment.

a. Upon delivery of this Note, OTK's election and promise to repurchase ████████████████████████████████████ of Misrendino's Class B Common Stock holding in OTK for ████████████████████████████████████████████████████████ is irrevocable, and the closing of OTK's repurchase of the foregoing shares is deemed to have occurred upon delivery of this Note to Misrendino.

b. OTK's repurchase of the remainder of Misrendino's shareholding in OTK, equal to █ ████████████████████████████████ shall be optional to OTK and the closing and repurchase of such Shares shall occur upon the election of OTK, in such increments as it determines in its sole discretion, provided that the requisite funds to be paid to Misrendino are timely made during the repayment period.

c. All payments shall be made in lawful money of the United States of America via post mail or at such other place as OTK may from time to time designate in writing to Misrendino. Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and the remainder applied to principal. There may be no prepayment of all or any portion of principal or interest. OTK hereby waives demand, notice, presentment, protest and notice of dishonor.

2. Security. This Note is an unsecured debt of the OTK. This Note is and shall be subordinated to all of the OTK's indebtedness to financial institutions.

3. Default.

a. Upon (a) the failure of OTK to timely make any payment due hereunder (provided, however, OTK shall have thirty (30) days to cure such default after receipt of a written notice from Misrendino that such payment was due); (b) a voluntary petition for relief under any bankruptcy or debtor relief law is filed by OTK; (c) an involuntary petition under any bankruptcy or debtor relief law is filed against OTK and is not dismissed within sixty (60) days; or (d) the sale or transfer or the attempted sale or transfer of substantially all of the assets or the transfer or the attempted sale or transfer of a majority of the membership interests in OTK, or Misrendino's breach of Section 3(b) below (each an "Event of Default"), Misrendino may, by written notice to OTK, declare that an Event of Default has occurred under this Promissory Note, whereupon all sums owing and to become owing to Misrendino hereunder shall, at the

option of Misrendino, become immediately due and payable. Such default interest is payable upon demand, however, shall be limited to such Shares that OTK has irrevocably agreed to repurchase as of the Event of Default.

b.      It shall also be an Event of Default of Misrendino should Misrendino violate any surviving term or condition of **Misrendino's Owner's Agreement** dated October 20, 2022 (including, without limitation, the exclusivity, morals, confidentiality or disparagement provisions) during the pendency of the Note, as determined by OTK in its sole discretion. In the case of this Event of Default, OTK shall have the right to immediately terminate and/or cancel this Note and Misrendino will be subject to refunding all funds remitted by OTK to Misrendino under this Note back to OTK. In addition, all Shares eligible to be repurchased by OTK under this Note shall immediately vest ownership in OTK without further payment obligation to Misrendino. The foregoing is the parties' best reasonable estimate of the damages likely to occur to OTK in case of such Event of Default, are generally difficult to ascertain, and that the intent of this Section 3(b) is proportionate and reasonable, and that such amounts are not a penalty to Misrendino or disproportionate to the actual damages that OTK may suffer.

4.      Presentment, Protest, Etc. OTK waives (to the fullest extent allowed by law) presentment, protest, demand, diligence, presentment, notice of dishonor, notice of protest and/or any and all other demand and/or notice of any form or nature whatsoever in connection with the delivery, acceptance, performance, default, enforcement or any other aspect of this Note.

5.      Waivers. No waiver or failure to enforce any default under any provision of this Note shall be considered to be a waiver of any subsequent default, regardless of the time, nature or form of the subsequent default. A failure of a party to exercise any of its rights upon the continuance of any existing default shall not constitute a waiver of such default.

6.      Governing Law. This Note shall be governed by and construed under the laws of the State of Texas as applied to agreements among Texas residents, made and to be performed entirely within the State of Texas. Notwithstanding any provision of this Note to the contrary, this Note shall be subject to the implied covenant of good faith and fair dealing.

7.      Notice. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.

8.      Severability. If any provision of this Note is determined to be in invalid, ineffective, inoperative, unenforceable or contrary to law, all of the remaining provisions of this Note shall remain in full force and effect.

9.      Indemnity; Costs, Expenses and Attorneys' Fees. The parties shall indemnify and hold each other harmless from any loss, cost, liability and legal or other expense, including attorneys' fees, which a party may directly or indirectly suffer or incur by reason of the failure of the other party to perform any of its obligations under this Note, or any grant of or exercise of remedies with respect to any collateral at any time securing any obligations evidenced by this Note (collectively, "Costs"), provided, however, the indemnity agreement contained in this Section shall not apply to any such costs which a party may directly or indirectly suffer or incur by reason of such party's own gross negligence or willful misconduct.

10. Entire Agreement; Amendments and Waivers.   This Note constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof.  Any term of this

Note may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the express written consent of the OTK. Any waiver or amendment effected in accordance with this Section shall be binding upon each future holder of this Note and OTK.

11. Officers and Directors not Liable. In no event shall any officer, agent or director of OTK be liable for any amounts due and payable pursuant to this Note.

**OTK MEDIA, INC.**

Title: Chief Executive Officer

## SCHEDULE A
### Payment Schedule

Following the execution of the Note, OTK shall pay to Misrendino annual installment of principal and interest, based on the following schedule:

