## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

## AUSTIN DIVISION

| | |
|---|---|
| **MATTHEW MISRENDINO a/k/a MATTHEW RINAUDO and MIZKIF ENTERPRISES, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**EMILY BETH SCHUNK, ZACK HOYT, OTK MEDIA, INC. d/b/a ONE TRUE KING, MYTHIC TALENT MANAGEMENT INC. and KING GAMING LABS, INC.,**<br><br>Defendants. | **Case No. 1:25-cv-01773-RP** |

## DEFENDANT EMILY BETH SCHUNK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I.    Introduction and Factual Background ................................................................. 4

II.   The Amended Complaint Must be Dismissed as to Misrendino ...................................... 10

    A.    Misrendino Intentionally Omits and Misrepresents the Context of Schunk's Statements ................................................................................................. 11

    B.    Schunk's Statements Contained her Protected "Emotional Truth" ..................... 17

III.  The Amended Complaint Must be Dismissed as to Mizkif Enterprises Because the First Amended Complaint Contains Absolutely no Allegations of Defamatory Statements by Schunk Relating to Mizkif Enterprises ...................................... 20

IV.   Plaintiffs Should not be Given Leave to Amend Their Deficient First Amended Complaint ............................................................................................... 22

V.    In the Alternative, Plaintiffs Should be Compelled to Specifically Identify the Falsity and Harm of Each Allegedly Defamatory Statement ........................................... 23

VI.   Conclusion ................................................................................................. 23

#5117576v3

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 10

*Bel Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). ................................................. 10, 11

*Benson v. Guerrero*, 702 S.W.3d 775 (Tex. App. 2024) ........................................ 17, 18, 19

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). .................................................... 12

*D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429 (Tex. 2017). ........................ 11

*Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018) ..................... 11, 12, 17, 18

*Foman v. Davis*, 371 U.S. 178 (1962) .................................................................... 22

*IAS Services Group, LLC v. Jim Buckley & Assocs., Inc*., 900 F.3d 640 (5th Cir. 2018) ............. 6

*In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) .............................................................. 12

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc*., 995 F. Supp. 2d 587 (N.D. Tex. 2014) ............................................................ 10

*Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023) ............. 11, 12, 17

*Patrick v. Wal–Mart, Inc.-Store No. 155*, 681 F.3d 614 (5th Cir. 2012) ............... 10

*R2 Invs. LDC v. Phillips*, 401 F.3d 638 (5th Cir. 2005) .......................................... 10

*Sefton v. Jew*, 204 F.R.D. 104 (W.D. Tex. 2000). ................................................. 23

*Torch Liquidating Tr. ex rel. Bridge Assocs. LLC v. Stockstill*, 561 F.3d 377 (5th Cir. 2009) ..................................................................................... 10

*Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000) .............................. 11

*Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142 (Tex. 2014) ......................................................................... 21, 22

**Statutes**

Texas Citizens Participation Act (TCPA) ................................................................ 18

**Other Authorities**

Restatement (Second) of Torts § 561 (1977) .......................................................... 23

Fed. R. Civ. P. 12 .................................................................................................... 5, 11, 24

#5117576v3

Defendant Emily Beth Schunk ("Schunk") hereby moves to dismiss the First Amended Complaint (Dkt. No. 25) filed by Plaintiffs Matthew Misrendino ("Misrendino") and Mizkif Enterprises, LLC ("Mizkif Enterprises" and, together with Misrendino, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. In the alternative, Schunk moves for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e).

A Rule 12 motion is a procedural motion made to test the only legal sufficiency of the First Amended Complaint. Unlike a substantive motion where the Court can weigh evidence and credibility, a Rule 12 motion addresses only whether the law provides relief for the facts alleged in the First Amended Complaint.

For clarity, Schunk strenuously denies the claims alleged in the First Amended Complaint and is confident that she will defeat Plaintiff's claims on the merits. However, for purposes of this motion, Schunk merely moves for dismissal of the First Amended Complaint (or, in the alternative, a more definite statement) on the grounds of its legal inadequacy. She looks forward to proving the lack of factual merit in the First Amended Complaint, if necessary, should the case progress past the pleading stage.

## I.    <u>Introduction and Factual Background</u>

The First Amended Complaint is a temper tantrum disguised as a legal filing. Plaintiffs' original Complaint contained only a single, two-sentence quote describing the supposedly defamatory statements by Schunk and Defendant Zack Hoyt ("Hoyt"). Hoyt rightfully filed a Motion to Dismiss the deficient Complaint, and Plaintiffs quickly admitted defeat and withdrew the Complaint. The First Amended Complaint contains more words than the original Complaint, but no more substance.

Misrendino is a "content creator," meaning that his primary occupation is the creation of "livestream"[1] or "streaming" content posted on various online platforms including, but not limited to, Twitch, YouTube, and Kick. As alleged in the First Amended Complaint, Misrendino earns

---

[1] A livestream is a video posted in real-time while the creator is speaking.

income by gaining subscribers who pay monthly to support his livestream content and through advertising within and next to his livestreams. *See* First Amended Complaint (Dkt. No. 25) at ¶ 13. In other words, the more eyeballs on his streams, the more money Misrendino makes.[2]

In this attention economy of content creators, Misrendino is seen as a middling creator. He is not as popular as Schunk, nor is he particularly well-liked in the community of content creators. His brand has been volatile for many years due to self-inflicted public controversies in which he pits himself against other content creators.

Schunk, in comparison, is at the top of her field. Schunk is best known for livestreaming videos on Twitch, where she plays video games, posts "cosplay"[3] content and speaks directly to her viewers. She is one of the most popular female streamers on Twitch with millions of followers across multiple platforms. She was recently profiled in Forbes for their "30 Under 30" list as the Head of their Games category, which described her as the "most watched female streamer on Twitch" with an expanding media empire.[4]

Unfortunately for Schunk, she entered into a romantic relationship with Misrendino in 2022. The relationship was disastrous and in January 2025, Schunk ended the relationship and ceased all communication with Misrendino.

In early October 2025, Schunk was assaulted by a member of the public at TwitchCon, an annual conference held by Twitch.[5] The assault was captured on video by a fan and caused a global media firestorm, particularly due to questions pertaining to Twitch's handing of the situation.[6]

Separately, Schunk had been receiving concerning information from multiple sources

---

[2] But at least Misrendino appears to, in fact, exist. Mizkif Enterprises, on the other hand, appears to be either a figment of Misrendino's imagination or a tax avoidance scheme. The First Amended Complaint claims that it is a limited liability company and a citizen of the state of California, yet it is not registered to do business in the State of California. The First Amended Complaint contains absolutely no facts about Mizkif Enterprises' business activities or how it generates income.

[3] "Cosplay" is a portmanteau of the words "costume" and "play" which describes the art of dressing up as specific characters from anime, movies, TV shows, games, and pop culture.

[4] *See* https://www.forbes.com/profile/emily-schunk/?list=30under30-games/.

[5] *See* https://mashable.com/article/streamer-emiru-twitch-mishandling-assault.

[6] *See*    https://www.nbcnews.com/news/us-news/twitch-faces-backlash-popular-streamer-emiru-says-was-assaulted-twitch-rcna238496.

#5117576v3

regarding Misrendino's inappropriate and highly-concerning behavior.  Misrendino was repeatedly harassing her through private messages, making inappropriate comments to friends and employees, attempting to interact with her at parties despite her attempts to avoid him, and discussing her in his livestreams and videos because of her decision to cut off their romantic relationship.  His behavior was escalating and Schunk decided that she was morally compelled to speak to the public about Misrendino's treatment of her and others.

On October 25, 2025, Schunk hosted a livestream on Twitch and later posted it to her YouTube account.  A true and correct copy of Schunk's entire livestream is attached to the Declaration of Emily Beth Schunk ("Schunk Declaration") at Ex. 1.  For the Court's convenience, a transcript of the livestream is also attached to the Schunk Declaration at Ex. 2.  This is the livestream that forms the basis of the First Amended Complaint.  *See* First Amended Complaint at ¶ 18.

In Schunk's livestream, she provides a brief update on the status of the recent incident at TwitchCon, and then delves into the history between herself and Misrendino.  She refers to him as "Mizkif," his online persona.  She describes their fractured romantic relationship and details the repeated instances of physical and emotional abuse she suffered at his hands.  She was emotional, often to the point of tears, and obviously deeply affected by their relationship and by the harm he had caused her for years.

Shortly thereafter, Misrendino responded with a stream of his own.  For more than 30 minutes, Misrendino complained about Schunk, criticized her, insulted her, and encouraged his followers to do the same.  He was rude, offensive, and cruel to his former partner.  A true and correct copy of Misrendino's entire livestream is attached to the Schunk Declaration at Ex. 4. For the Court's convenience, a transcript of the livestream is attached to the Schunk Declaration at Ex. 5.[7]

---

[7] On a motion to dismiss, the Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *IAS Services Group, LLC v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640 (5th Cir. 2018).  Here, the two livestreams are demonstrably central to the claims and

Yet, shockingly, amongst the insults and crude comments, Misrendino made a few surprising admissions. Below is a collection of exact quotes from Misrendino's livestream (unlike the First Amended Complaint, Schunk presents full quotes without heavy editing and interpretation):

- She brushed over [in her livestream] that I threw water bottles or my phone near her, but that wasn't during fights. I want to make that very clear. It would be me throwing my phone on my bed when I brushed my teeth. **She did tell me she got a bruise from it and I stopped.** Schunk Declaration, Ex. 4 (livestream) and 5(transcript) at approx. [4:07].

- In regards to being controlling, I told her many things. I told her to dress older, to stop wearing pajamas, to stop talking about stalkers and schizos [sic] as a whole, stop talking about past relationships, and yes, I didn't want her to travel without me. I also said that I didn't want her to hang out with specific people. Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 12:01.

- **I know I was controlling** and I should have just ended the fucking relationship, but I was so confused as a person. And I'm sorry I didn't. I'm sorry things got to this point, man. **The last nine months of this**

---

referenced in the First Amended Complaint. Schunk's livestream is repeatedly quoted in the First Amended Complaint, although never attached in full. Misrendino's livestream directly responded to and commented on Schunk's livestream, including by admitting that many of Schunk's statements were true (while bizarrely planning to sue her for defamation for the same statements). Misrendino's video is also obliquely referenced in multiple places in the First Amended Complaint. *See, e.g.*, First Amended Complaint at ¶ 25 (Misrendino complains that the various entities did not ask for his "comment or any information in his possession disproving the allegations" by Schunk, when in fact his comments were in his own competing livestream). In Paragraphs 27-33, the First Amended Complaint alleges that Hoyt engaged in defamation by commenting on Misrendino's livestream – the very same livestream attached as Exhibit 4 to the Schunk Declaration. As explained in detail in Hoyt's Reply in support of his Motion to Dismiss the First Amended Complaint (Dkt. No. 36) at pp. 3-4, Hoyt's livestream is a picture-in-picture commentary on Misrendino's livestream. Hoyt was reacting to Misrendino's livestream in real time. Misrendino's livestream is a critical factual puzzle piece the Court must consider when evaluating the weaknesses in the First Amended Complaint. Both Schunk's video and Misrendino's video have been authenticated and attached to the Declaration of Emily Schunk, filed in support of this Motion to Dismiss. To the extent this is necessary, Schunk respectfully requests for this Court to take judicial notice of Exhibits 1-5, attached to Schunk's Declaration, in considering the instant Motion to Dismiss.

**relationship, things got extremely fucking toxic.** Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 12:01-12:42.

- Every month went by the last year and I our fights started to get louder. We were breaking up with each other almost weekly. Fights were getting more aggressive and shouting began to increase. I was not perfect and I reflect on those situations poor poor taste of myself. I'm ashamed that the situations got so bad, but Emi was also violent. **She would throw clothes or plushies at me and I punched holes in the walls or slammed doors in aggression**. Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at 13:36.

- **I one time did say I was going to kill myself during an argument.** Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 13:36.

- We cuddled for about 30 minutes and started to kiss. She said that she was okay with this on her stream and I started to advance to the next stage because I thought that's what she wanted. **She yelped and I immediately sprung up and was scared if I did anything wrong or did wrong in general. I got scared and left the house. I apologize if that made Emi uncomfortable for me not saying sorry and I wish I said sorry back then,** but we got back together soon afterwards.[8] Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 15:17.

- I've realized over the years of over the years of two relationships now online that **I'm a horrible boyfriend** and I have a lot to work on for myself. Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 18:59.

- I have things I will be leaking over the next few days of other people, of other things. **I have a lot of messages that I have that I'm going to expose as time goes on because I do believe that this is a time to go fucking buck wild.** Um but I want to make it very clear when it comes to Emiru when she says that I was uh getting ready to go after her and that I was going to use her rabbits against her. That was never the plan. My plan for myself was very simple. **If Emi were to say anything about me, I would say something back.** That's it. I never had a plan in my life to go after her or do anything. **It was if she ever said anything, I would say something as well.** And that's completely understandable. Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 18:59-20:08.

---

[8] As with much of Misrendino's statements, this is an entirely fabricated description of the events that occurred between Schunk and Misrendino. Schunk is deeply offended and saddened by his vindictive and callous statements regarding of one of the worst events of Schunk's life.

- Can [I] clarify what if anything was said to her team at TwitchCon? **I said that if she goes after me, then I will go nuclear.** And that is exactly what I said. And that is what's going to happen because you can't mess with me anymore. I don't have anything to lose. I'm sorry. I don't. Go after me all you want. I have nothing to lose. Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 20:32.

- **And I don't like that she was portraying that it was just me who was at fault**. It was a toxic relationship and that's what it was.[9] Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 21:18.

After Schunk and Misrendino's livestreams, Defendant Hoyt posted a series of livestreams of his own (as discussed in greater detail in Hoyt's Amended Motion to Dismiss (Dkt. No. 32), Plaintiffs' claims as to Hoyt are similarly weak). In addition, OTK Media Inc., Mythic Talent Management Inc. and King Gaming Labs, Inc. ousted Misrendino as a result of his actions towards Schunk and others.

Yet just days after admitting to the world that he was abusive, controlling, and toxic, Misrendino filed a claim against Schunk, among other claims. Misrendino now claims that the behavior he admitted to and even embraced in his October 26, 2025 livestream is actually false and Schunk was defaming him by speaking her truth.

Misrendino is attempting the very smear campaign he promised in his livestream. He has "nothing to lose" and, like so many men before him, is attempting to use the Court system to intimidate Schunk into silence. This is his "nuclear" option. He has been constantly harassing Schunk online since filing this lawsuit while mobilizing his fanbase to attack her online. He has openly stated that his goal is to influence the court of "public opinion," not the court of law. This case is a sham intended to silence the woman bringing his misconduct to light.

For the reasons set forth below, the Court must dismiss the First Amended Complaint and end this charade. The First Amended Complaint simply does not state a valid claim of defamation against Schunk. It intentionally and strategically quotes individual words or phrases from Schunk's

---

[9] He has also stated that he was "suicidal, depressed, and taking every type of drug possible to fix my brain." *See* Hoyt Amended Motion to Dismiss (Dkt. No. 32) at 2. He discusses his use of steroids and illegal drugs, and stated that the steroids gave him "insane anger issues." *Id*. at 2-3.

livestream in order to distort her statements, depriving the Court of the full context of her words as is required on a claim of defamation. Further, the livestream plainly represents Schunk's "emotional truth," which is protected and not subject to a claim of defamation. Alternatively, the Court should require Plaintiffs to specifically identify and articulate the exact sentences by Schunk that are supposedly defamatory (without creatively quoting and interpreting her words) and identify how and who was harmed by the statements.

## II.    **The Amended Complaint Must be Dismissed as to Misrendino**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bel Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc*., 995 F. Supp. 2d 587, 602 (N.D. Tex. 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155*, 681 F.3d 614, 617 (5th Cir. 2012)); *see Torch Liquidating Tr. ex rel. Bridge Assocs. LLC v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain recovery.") (internal quotation marks and citations omitted). Moreover, the plaintiff's complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Indeed, "'naked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to plaintiffs" nor accept "conclusory allegations,

unwarranted deductions, or legal conclusions.").

"To prevail on a claim of defamation, a plaintiff must prove (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023) (citations omitted). "In a defamation case, the threshold question is whether the words used are reasonably capable of a defamatory meaning. In answering this question, the inquiry is objective, not subjective…. If a statement is not verifiable as false, it is not defamatory." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) (citations and quotations omitted).

### A.    Misrendino Intentionally Omits and Misrepresents the Context of Schunk's Statements

In order to prevail on his claims of defamation, Misrendino must state "direct allegations" articulating the exact nature of the statements at issue, how they were false, and why they are capable of a defamatory meaning. However, the First Amended Complaint is little more than "labels and conclusions" (*Twombly*, 550 U.S. at 555) hastily thrown together without any explanation or logic.

Paragraphs 18-20 of the First Amended Complaint identify a handful of statements by Schunk during her October 25, 2025 livestream that were purportedly defamatory towards Misrendino. However, Misrendino intentionally omits to inform the Court of the fact that Schunk's livestream was nearly ninety minutes long. *See* Schunk Declaration, Ex. 1 (livestream) and 2 (transcript). Misrendino selectively quoted single words and fragments out of a ninety-minute livestream in order to dramatize and manipulate the actual context of the livestream.

Texas law is clear that the Court must evaluate the entire statement in order to determine whether defamation has occurred. "In making the initial determination of whether a publication is capable of a defamatory meaning, we examine its 'gist.'" *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). That is, we construe the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Ibid* (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)); *see also Bentley*

*v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002).  "[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."  *In re Lipsky*, 460 S.W.3d 579, 594 (Tex. 2015).

Even a false statement is not defamatory "if the context of those statements discloses that they reflect an opinion."  *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023).  "And even when a statement *is* verifiable as false, it does not give rise to liability if the entire context in which it was made discloses that it is merely an opinion masquerading as fact."  *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018).  "Thus, statements that cannot be verified, as well as statements that cannot be understood to convey a verifiable fact, are opinions. Whether a statement is an opinion is a question of law."  *Ibid*.

The First Amended Complaint must be dismissed because Misrendino completely fails to provide the context of Schunk's statements.  Of the litany of supposedly defamatory statements, Misrendino includes only a single full-sentence quote at Paragraph 19.  The remaining statements alleged in the First Amended Complaint are chopped and edited to the point where quotes have no meaning.

For example, Misrendino claims at Paragraph 20(n): "That Rinaudo was 'screaming' at her due to her cat."  *See* First Amended Complaint at ¶ 20(n).  That bizarre statement is a complete quote from the First Amended Complaint – that is the entire sub-paragraph, word for word.  This strange claim is made with no context and no explanation.  The Court is left to guess what "due to her cat" means, what Schunk supposedly said, or why screaming at someone "due to her cat" is supposed to be a false statement capable of a defamatory meaning, as is required for a defamation claim.  Determining whether a statement is defamatory is question of whether a "reasonable person" of "ordinary intelligence" would perceive it, yet Misrendino provides no information by which such a reasonable person could interpret such a vague and confusing claim.

Similarly, Misrendino claims that it was defamatory when Schunk said that "at a party she 'felt' Rinaudo was 'following' her, 'monitoring' her, and 'watching' her and then later made 'eye contact' with her and said 'Ooo.'"  *See* First Amended Complaint at ¶ 20(q).  Again, Misrendino

#5117576v3

strings together specific words picked out of Schunk's livestream to make an implication that Schunk said something defamatory, yet does not provide the full quote. Regardless, Misrendino's claims in this sub-paragraph simply make no sense. Even if Schunk's statement was false (which it was not, as admitted by Misrendino himself[10]), how is a statement that someone followed her around the room, made eye contact, and then said "ooo" a statement capable of a defamatory meaning? What damage could that statement possibly cause to Misrendino? No reasonable person of ordinary intelligence would ever believe that statement to be capable of a defamatory meaning.

At Paragraph 20(s), Misrendino complains that Schunk stated that she was receiving "harassment and hatred from him and his community, while he was the whole time secretly begging for me to take him back behind the scenes." Yet Misrendino never articulates why Schunk's statements were false, or why they defamed him. Embarrassment for being exposed does not meet the legal elements of a defamation claim.

In other instances, Misrendino intentionally omits critical portions of Schunk's statements that demonstrate her truth. For example, Misrendino claims that Schunk stated: "That Rinaudo's plan was to 'claim that I kill animals and that I killed my own rabbits.'" First Amended Complaint at ¶ 20(d).[11] Yet, the full quote reveals that Schunk was repeating statements made by others: "*Multiple people have told me* that his plan was to claim that I kill animals and that I killed my own rabbits since I had several of my rabbits passed away over the course of three years while I lived with him." Schunk Declaration, Ex. 1 (livestream) and 2 (transcript) at approx. 24:13. Misrendino

---

[10] In Misrendino's own words, "I did see her at a party once at Simply's house. The house was very small and I opened the door. I said, 'Whoops.'" Schunk Declaration, Ex. 4 (video) and 5 (transcript) at approx. 17:37.

[11] Misrendino does not include any explanation or history underlying this statement, evidencing why Schunk was forced to bring this Rule 12 Motion. For the Court's clarity, Schunk is an animal lover and has had several beloved pet rabbits over the years. Sadly, some of those rabbits have died over the years (as is common with household pets). Misrendino seems to have made it his mission to baselessly criticize Schunk's treatment of her rabbits. He mentions it repeatedly in his video, and specifically admits his scheme to use his false claims about her rabbits to punish her for speaking about him. Schunk Declaration, Ex. 4 (video) and 5 (transcript) at approx. 20:08.

conveniently ignores and misrepresents the full quote in order to pretend that this was something Schunk created when, in reality, she clearly stated that it was something that was told to her by others.

Similarly, at Paragraph 20(a), Misrendino claims that Schunk defamed him by stating that his "alleged behavior or acts towards her or 'something similar' were allegedly done to someone else." Setting aside the fact that this sentence is nonsensical and confusing, it also entirely misstates Schunk's actual words. She actually stated: "*I was informed by three separate people*, one of whom was present for said incident that he had done something similar to something that he had done to me and to someone in LA at the end of September." Schunk Declaration, Ex. 1 (livestream) and 2 (transcript) at approx. 21:51. Once again, Misrendino misrepresents the quote to omit the fact that Schunk explicitly stated that she was repeating information provided to her by others, rather than asserting it herself as fact. Misrendino uses this formula over and over again, obliquely referring to Misrendino's "behavior" without identifying Schunk's actual statements or descriptions of bad behavior (*see*, *e.g.*, Paragraph 20(g) ("Rinaudo was 'testing your boundaries' and that his alleged 'behavior' got worse over time")) or complaining multiple times about the same statements with vague allusions to "reiterat[ing] some of the same allegations (*see*, *e.g.*, Paragraph 20(t)).

Misrendino simply does not – and cannot – back up his claims by examining Schunk's entire statement. For ninety minutes, Schunk bared her soul in a deeply emotional and vulnerable livestream laying out her story. By removing the context (the "gist") of Schunk's statements, the Court is not afforded the opportunity to hear in Schunk's own words the emotional truth she conveyed.

Misrendino also intentionally omits the portions of Schunk's livestream that validate her statements, presumably because he knows that they undermine his entire case. For example, at paragraph 20(i) of the First Amended Complaint, Misrendino claims that that Schunk defamed him by stating that Misrendino "made statements" in connection with a 2024 incident in which Misrendino became extremely angry and aggressive because Schunk's stream was more popular than his. Yet the Amended Complaint neglects to mention that Schunk displayed screenshots of

messages with Misrendino in which Misrendino repeatedly berates and belittles her because of his jealousy over her popularity. *See* Schunk Declaration, Ex. 1 (livestream) and 2 (transcript) at approx. 20:20; 52:37; 1:00:42; 1:02:22 and 3 (screenshots).

Once again, Misrendino strategically cherry-picks words from Schunk's livestream, inserts his own implications and analysis of her words, and then neglects to even mention that Schunk proved her statements right there in the same livestream. Schunk's ninety-minute livestream was longer than some movies released in theaters, yet Misrendino attempts to narrow it down to a handful of words.

Misrendino also neglects to inform the Court that many of Schunk's statements were validated as true just a few hours later in Misrendino's own livestream. For example, Misrendino complains that Schunk stated that a "slammed door broke" (¶ 20(i)), that he would "destroy furniture, throw things, destroy walls, banging on the door, and screaming at her" (¶ 20(j)), that he would "scream at her while she was asleep" (¶ 20(l)), and that he was "physically aggressive" (¶ 20(m)). Yet Misrendino actually admitted this fact in his livestream: "fights were getting more aggressive and shouting began to increase…. I punched holes in the walls or slammed doors in aggression." Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 13:36. He also repeatedly describes their relationship as toxic and says he was a "horrible boyfriend." *Id.* at approx. 18:59. It is abundantly clear from Misrendino's own statements that Schunk's portrayal of him was entirely accurate.

As another example, at Paragraph 20(b), Misrendino alleges that Schunk stated that "Rinaudo 'indirectly threatened' her and approached other people about a 'smear campaign' against her and to 'join with him' in assistance." Similarly, at Paragraph 20(c), Plaintiffs allege that Schunk stated that Misrendino "threatened one of her employees and told him he would 'destroy' her if she spoke about him. Again, Misrendino admitted to this in his stream, stating that he was going to "expose" her and go "fucking buck wild." Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 18:59. "I said that if she goes after me, then I will go nuclear…. And that is what's going to happen because you can't mess with me anymore. I don't have anything to lose. I'm sorry. I

don't. Go after me all you want. I have nothing to lose." Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 20:32.

Similarly, the First Amended Complaint alleges that Schunk's statements regarding Misrendino's controlling and toxic behavior were defamatory. She stated that he was "controlling" over her clothes and friends (¶20(e), when she "streamed" (i.e., posted her livestream content online) (¶20(h)), and that he would "coach" and "hammer into" her (¶ 20(o)). And yet in his own words, he admits to telling her how to dress, who to speak to, what to speak about, and who to contact. He says, "I know I was controlling and I should have just ended the fucking relationship, but I was so confused as a person…. The last nine months of this relationship, things got extremely fucking toxic." Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 12:42.

Misrendino also admits in his livestream that Schunk's statements regarding his driving habits were true. She said that he would drive "'like 150 miles an hour' and one time said 'now we're both going to die like threatening to kill both of us.'" (¶ 20(k)). Yet Misrendino admits, "I drive fast literally everywhere… I drive fast all the time… I don't remember the exact speed she got up to, but we were definitely flying." Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 22:05.

Further, at Paragraph 20(f), the First Amended Complaint alleges Schunk made statements that Misrendino would "throw objects (bottles, phones, etc.) at her and that one time it gave her a black eye." Setting aside the fact that this is an interpretation of Schunk's statements, not an actual quote, Misrendino also admitted to hurting Schunk by throwing objects. He says that he threw "water bottles or my phone" but that it was only *near* her, not directly *at her*. Yet, he still admits that "she got a bruise from it." Schunk Declaration, Ex. 4 (livestream) and 5 (transcript) at approx. 4:07.

In order to prevail on a claim of defamation, Misrendino must plausibly plead that Schunk's statements were false, yet *he admitted that they were true just a few hours later*. The First Amended Complaint must be dismissed because Misrendino fails to provide the entire context of Schunk's statements, or admit to his own damning statements, which would defeat his claims entirely.

**B.    Schunk's Statements Contained her Protected "Emotional Truth"**

Texas law has long held that even a verifiably false statement is not defamation if the context of that statement reveals that the statement was merely a reflection of an opinion, not a statement of fact.  *See Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d at 363; *see also Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d at 639.

The Court of Appeals, First District, recently took up this exact issue in a case strikingly similar to the one at bar.  In *Benson v. Guerrero*, 702 S.W.3d 775 (Tex. App. 2024), a daughter made a TikTok video in which she accused her stepfather of sexual assault and accused her mother (a famous wrestler) of knowing about the assault and refusing to do anything to protect her.  The mother and stepfather filed suit, alleging that the daughter's claims constituted defamation because she accused the stepfather of the crime of sexual assault and the mother of the crime of tampering with a witness.  There, the daughter was able to take advantage of the Texas Citizens Participation Act's ("TCPA") expedited procedures to move to dismiss the defamation claims filed by her mother and step-father.  Here, Misrendino filed this case in federal court in order to avoid the TCPA, because the TCPA would give Schunk and the other defendants the opportunity to actually address his false claims on the merits and end this case quickly.

In *Benson*, the mother claimed that the daughter made several false and defamatory statements that seemed factually verifiable on their face, including that the mother (1) knew her daughter had been sexually assaulted by her step-father but did not care, (2) characterized the sexual assault as a "mistake," (3) told her daughter that the assault was not the mother's problem, (4) failed to protect the daughter from sexual assault, and (5) abandoned her daughter in support of the step-father, who she knew had sexually assaulted her daughter.  *Id*. at 787-88. The court analyzed the entire context of the video, noting that the daughter expressed her unhappiness with the estrangement between her and her mother.  *Id.* at 789.  The court held that the entire context showed that the daughter's statements were not actionable because she was sharing her "personal viewpoint, i.e., her own emotional truth and not purported fact."  *Id*.

Here, in Guerrero's TikTok video, she sat alone on the floor of her apartment, where her cat occasionally wandered into view. Noting that her family was "well known," Guerrero stated that she was tired of getting messages accusing her of not reaching out to her mother, Vickie, and she felt like she needed to protect herself by "saying [her] piece" about how the situation between her and Vickie came to be. She then gave her view of how the rift occurred….

The statements that Vickie alleges as defamatory, when viewed in context, are part of Guerrero's description of how she became estranged from Vickie and how she felt about it. Even if Vickie were correct that certain statements, in which Guerrero purportedly recounted what Vickie had said to her, involved objectively verifiable facts, viewing the TikTok video as a whole shows that Guerrero shared her personal viewpoint, i.e., her own "emotional truth," and not purported fact. In the informal and intimate setting of the video, Guerrero described her emotional journey and expressed her sadness about being estranged from her family. Her recollections about her conversations with Vickie and how they led to Guerrero's feelings of abandonment were no more than "opinion masquerading as fact."

*Benson* at 789 (Tex. App. 2024) (quoting *Dallas Morning News*, 554 S.W.3d at 639).

Here, with the context of the entire ninety-minute livestream, it is clear that Schunk is telling her own emotional truth, explaining how their relationship came to an end and the struggles Schunk endured during their relationship. The livestream was spontaneous, unedited, and unscripted, underscoring that Schunk was not delivering a rehearsed narrative, but instead, was speaking openly and vulnerably in the moment – her truth as she experienced it. Like the daughter in *Benson*, Schunk's allegedly defamatory statements were either non-actionable statements of opinion or merely opinions "masquerading as fact."

For example, she discusses at length the pain she felt that her partner – whom she cared for deeply and whose approval she craved – repeatedly punished her for her success:

So basically, I felt like I was kind of stuck in a loop where I felt like I had to constantly perform and like prove my value to not be thrown away, but at the same time, if I ever performed too well, I was going to be punished for it. And it just felt like a very rough situation to be stuck in because I mean streaming is my hobby and my job like it's a huge part of my life even before you know I met him and became like a larger creator.

And I remember thinking all the time how it felt like he hated me but he still wanted me around for his channel and like his thumbnails and everything.

*See* Schunk Declaration, Ex. 1 (livestream) and 2 (transcript) at approx. 42:14.

These statements are nearly identical to the daughter's statements in *Benson*. Schunk is expressing her heartfelt emotional journey over several years with an admittedly toxic man. Her story is admirable, and, in telling it, she is stating her "emotional truth," not some statement of decisive fact.

Interestingly, the *Benson* case also directly dealt with the question of whether accusing someone of "sexual assault" constitutes defamation. There, the daughter used the term "sexual assault" without explaining exactly what occurred between her and her stepfather (unlike in the First Amended Complaint, there the court had the benefit of the daughter's entire statement to review). *Benson* at 780. The court held, "because the Texas Penal Code defines a criminal offense as 'sexual assault' and Guerrero published a statement that Kris had 'sexually assaulted' her, without further explanation, the words Guerrero used were reasonably capable of a defamatory meaning, i.e., that Kris had committed the criminal offense of sexual assault against her." *Benson* at 775. For purposes of the TCPA, this was sufficient for the father's claims to survive the initial challenge by the daughter.

Misrendino will certainly focus on Schunk's use of the term "sexual assault" and argue that Schunk's statements are necessarily defamatory because they include the same term. However, in comparison to *Benson*, here, Schunk described in detail the exact nature of Misrendino's assault against her. Bizarrely, this is the one sentence that Misrendino actually quotes in the First Amended Complaint: "He started kissing me in my face and I let him do it . . . and then suddenly he tried to climb on top of me and aggressively shoved his hands down my pants and I screamed. And when I screamed he jumped off me, like a cat." First Amended Complaint at ¶ 19.[12]

---

[12] The full quote without Misrendino's omissions is as follows:

#5117576v3

Taking the whole context of Schunk's statement into account, as the Court is required to do, the situation is very different than the step-father in *Benson*. Schunk describes exactly what happened to her and, although she defines it as sexual assault, a reasonable viewer would unquestionably understand that that term is her own description of what happened to her. The viewer is not left to guess as to the nature of the assault based solely on the term "sexual assault," like in the *Benson* case, which focused on the fact that the daughter did not actually describe the alleged assault.[13]

Just like in *Benson*, Schunk's statements are not actionable as defamation because they show her "personal viewpoint, i.e., her own emotional truth and not purported fact." The Court should dismiss the First Amended Complaint as to Misrendino.

## III.    The Amended Complaint Must be Dismissed as to Mizkif Enterprises Because the First Amended Complaint Contains Absolutely no Allegations of Defamatory Statements by Schunk Relating to Mizkif Enterprises

Count Two of the Amended Complaint, which is scantily and sloppily pled, contains absolutely no allegations pertaining to defamation by Schunk of Mizkif Enterprises. In fact, it is

---

A week after this breakup, he asked to come over to my house and talk for closure. He came to my house and I was crying like crazy because the emotions were just very high because I was dealing with a lot of major shifts in my life as a result of me attempting to start to try to distance myself from him. [S]o yeah, we were just talking and I was crying a lot. He started to try to comfort me by hugging me while I was sitting on the couch and holding me really close to him. And when this was happening, we hadn't talked in quite a while. And I'm usually very uncomfortable with being touched a lot by people that I'm not in a relationship with. But I let him hold me while I was crying and he started kissing me in my face and I let him do it. I was still sobbing a lot. And then um suddenly he tried to climb on top of me and aggressively shoved his hand down my pants and um I screamed. […] And when I screamed, he jumped off me like a cat like. And instead of apologizing or checking if I was okay, he said, "I feel weird now. I feel like I did something wrong. I have to go." And he immediately left my house while I was still crying without checking if I was okay or anything.

Schunk Declaration, Ex. 1 (video) and 2 (transcript) at approx. 49:30.

[13] Misrendino's version of events is minimizing and cruel, but he also admits to his misconduct: "I started to advance to the next stage because I thought that's what she wanted. She yelped and I immediately sprung up…." Schunk Declaration, Ex. 4 (video) and 5 (transcript) at approx. 15:17.

#5117576v3

unclear if Plaintiffs even intended to include Mizkif Enterprises in Count Two at all.

The only references in Count Two which would include Mizkif Enterprises are to "Plaintiffs" collectively. Paragraph 41 states, "Plaintiffs" incorporate the prior factual allegations into Count Two – a boilerplate paragraph seemingly copied and pasted from another document. And at paragraph 44, the Amended Complaint states that the defamatory statements "have caused severe damage to *Plaintiffs'* reputation and business and have caused severe emotional distress and mental anguish." Yet the factual allegations in Count Two apply only to Misrendino, leading to the conclusion that paragraph 44 may also have been a copy-paste error by Plaintiffs. For example, Paragraph 42 alleges that the defamatory statements were all "concerning Rinaudo" (Misrendino's pseudonym).

There are no allegations in the entire First Amended Complaint that Schunk made any statements whatsoever about Mizkif Enterprises, defamatory or not. There is no claim that Schunk even ever *used* the words "Mizkif Enterprises."

Further, Paragraph 43 alleges that Schunk and Hoyt made the allegedly defamatory statements with actual malice because they "stood to benefit from Rinaudo's ouster from OTK and the associated companies." Yet Mizkif Enterprises had nothing to do with OTK or the associated companies. Only Misrendino held an interest in OTK, not Mizkif Enterprises. *See* Amended Complaint at ¶ 14. OTK sent Misrendino, not Mizkif Enterprises, the letter purporting to terminate his interest in the companies. *Id.* at ¶ 21. It was Misrendino's shares, not Mizkif Enterprises' shares, that were reclaimed by OTK. *Id*. at ¶ 22. Thus, even if Schunk had made some defamatory statement regarding Mizkif Enterprises (which she did not, as Plaintiffs admit by failing to include any such statement in the Amended Complaint), it could not have been made with the requisite intent.

There are simply no allegations in the Amended Complaint concerning any allegedly defamatory statements made by Schunk against Mizkif Enterprises.

To be sure, a corporation can maintain a claim of defamation. *See Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 150 (Tex. 2014). If Plaintiffs indeed

intended to include Mizkif Enterprises in Count Two, presumably they will argue that Schunk's allegedly defamatory statements harmed Mizkif Enterprises by virtue of the purported harm to Misrendino. That is – a defamation of Misrendino is a defamation of Mizkif Enterprises, and vice versa.

Unfortunately for Plaintiffs, that's not how the law works. There is a critical distinction between defamation of the owner of a company versus the company itself. "A corporation is not defamed by communications defamatory of its officers, agents or stockholders unless they also reflect discredit upon the method by which the corporation conducts its business." Restatement (Second) of Torts § 561 (1977), cmt. b. This exact issue was raised in *Waste Mgmt.*, 434 S.W.3d 142. The court noted that, under the Restatement, defamation specifically injured the reputation of the owner, not the owner's business; thus, the statements at issue were defamatory of plaintiff (the owner), not its landfill-services operations (the business). *Waste Mgmt.*, 434 S.W.3d at 151, fn. 35.

Here, there are no allegations *whatsoever* pertaining to Mizkif Enterprises' business. In fact, there are no allegations as to the kind of business Mizkif Enterprises performs, let alone any harm to that business. Thus, the First Amended Complaint must be dismissed as to Mizkif Enterprises, entirely.

## IV.    Plaintiffs Should not be Given Leave to Amend Their Deficient First Amended Complaint

Plaintiffs will surely argue that they should be given the opportunity to cure the many defects identified by Schunk herein. Yet, Plaintiffs have already had two bites of the apple – an original Complaint and a First Amended Complaint – and still have not articulated a valid claim. A court may properly deny leave to amend in situations involving "repeated failure to cure deficiencies by amendments previously allowed." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiffs should not be given a third attempt to make the same mistakes.

## V.     In the Alternative, Plaintiffs Should be Compelled to Specifically Identify the Falsity and Harm of Each Allegedly Defamatory Statement

In the event that the Court is not inclined to dismiss the First Amended Complaint outright, Schunk moves the Court for an order compelling Plaintiffs to make a more definite statement. Rule 12(e) motions are appropriate when the complaint is "sufficiently intelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed." *Sefton v. Jew*, 204 F.R.D. 104 (W.D. Tex. 2000). In such cases, a more definite statement of a pleading is required when the pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).

First, Plaintiffs failed to present the entirety of Schunk's allegedly defamatory statement to the Court. As set forth in Section II(A), *supra*, the Court must take the entire context of Schunk's statements into account. The Court should compel Plaintiffs to include the entirety of Schunk's livestream and identify the exact, *accurate* quotes from the livestream which are supposedly defamatory, without any commentary or supposed explanation included in the First Amended Complaint. The Court should have the benefit of reading Schunk's actual words when making a determination as to their nature.

Second, Plaintiffs should be compelled to specifically identify why each (actual, quoted) statement by Schunk is (1) untrue; and (2) harms either or both Plaintiffs.

It is impossible for Schunk to determine what allegations Misrendino admits versus denies, how the statements are supposedly defamatory, or what harmed Misrendino personally versus his company. If this case is not simply dismissed for the reasons set forth above, the Court should compel Plaintiffs to specifically identify the entire statement by Schunk that forms the basis of their (entirely wrongful) claim of defamation and articulate each element of the claim.

## VI.     Conclusion

For the foregoing reasons, the Court should dismiss the First Amended Complaint as to Schunk, in its entirety. Alternatively, the Court should compel Plaintiffs to clearly and specifically articulate their claims in a more definite statement.

#5117576v3

DATED:  March 3, 2026

Respectfully submitted,

*/s/ Jessica R. Corpuz*

Jessica R. Corpuz
California Bar No. 279237 (*pro hac vice* pending)
jcorpuz@weintraub.com
Carly M. Moran
California Bar No. 333661 (*pro hac vice* pending)
cmoran@weintraub.com
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191


Daniel H. Byrne
Texas Bar No. 03565600
dbyrne@fritzbyrne.law
**FRITZ BYRNE, PLLC**
402 West Seventh Street,
Austin, TX 78701
Telephone: (512) 476-2020

**ATTORNEYS FOR DEFENDANT EMILY BETH SCHUNK**

#5117576v3

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was electronically submitted to the Clerk of Court for the U.S. District Court, Western District of Texas, using the CM/ECF system. A true and correct copy of the foregoing document was served upon all counsel record via the Court's electronic filing service in accordance with the Federal Rules of Civil Procedure on March 3, 2026.


*/s/ Jessica R. Corpuz*
Jessica R. Corpuz

#5117576v3